[No. G034577. Fourth Dist., Div. Three. Aug. 29, 2006.]

CLIFFORD GAMBLE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, GALLAGHER
BASSETT SERVICES et al., Respondents.

72

**COUNSEL**

Law Offices of Lon E. Peek II and Lon E. Peek III for Petitioner.

Neil P. Sullivan for Respondent Workers' Compensation Appeals Board.

Law Offices of Robert Wheatley, Robert Wheatley and Anthony Oropallo for Respondents Gallagher Bassett Services and United Airlines.

## OPINION

**O'LEARY, J.**—The Workers' Compensation Appeals Board (the Board) ordered employer, United Airlines,[1] to provide vocational rehabilitation maintenance allowance (VRMA) benefits to an injured worker, Clifford Gamble, but allowed United a credit for wages Gamble earned at his concurrent employment at the Los Angeles Unified School District (the School District). Gamble asserts the Board erred in allowing such a credit and argues the credit unfairly penalizes an injured worker who must work two jobs to support himself and his dependents and amounts to a windfall to the employer as a result of the worker's diligence. United contends Gamble is not entitled to any "wage loss" because VRMA benefits cannot exceed $246 per week and because Gamble's School District earnings alone exceed this statutory maximum. Gamble does not dispute the statutory maximum, but insists his earnings from his second job are not a proper consideration in calculating United's liability for VRMA benefits. We agree with Gamble and conclude the Board's finding is unsupported by the statutory or case law. Accordingly, the decision of the Board is annulled.

### I. Background on Workers' Compensation

Workers' compensation is not an area of the law that routinely gives rise to California appellate court decisions. For this reason, we begin with a brief synopsis of this state's workers' compensation scheme and its development, an overview of the common jargon, and a discussion of the relevant legal provisions.

"More than 90 years ago, our Legislature was directed to 'create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment irrespective of the fault of either party.' [Citation.] . . . The Legislature complied with this directive by enacting various provisions of the Labor Code." (*Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1288 [135 Cal.Rptr.2d 665, 70 P.3d 1076] (*Lauher*), fn. omitted.)

" 'This system attempts to assure employees of an expeditious remedy both adequate and certain, independent of any fault on the part of employees and employers. At the same time, it provides the employer with a liability which

---

[1] Respondents are Gallagher Bassett Services and United Airlines. For ease of reference, we refer to the Respondents collectively as United.

is determinable within defined limits. It represents a philosophy that industry, as a cost of doing business, should provide for the care and rehabilitation of workers disabled by work injuries. In this way, society supports the program as a[n] integral element of commerce and industry, rather than through tax-supported plans.' [Citation.]" (*Lauher, supra,* 30 Cal.4th at p. 1289.)

"In creating and maintaining a system of workers' compensation, the people of this state made an important public policy decision and transformed how we address workplace injuries. It should be remembered, however, that the purpose of an award under the workers' compensation scheme ' "is not to make the employee whole for the loss which he has suffered but to prevent him and his dependents from becoming public charges during the period of his disability. . . . In short the award transfers a portion of the loss suffered by the disabled employee from him and his dependents to the consuming public. . . . Complete protection is not afforded the employee from disability because this would constitute an invitation to malinger or to be careless on the job as he would then lose nothing in assuming a disabled status." ' [Citation.]" (*Lauher, supra,* 30 Cal.4th at pp. 1289–1290.)

## A. *The Basic Components of the Compensation Scheme*

The basic compensation scheme has two key components: (1) disability indemnity, and (2) vocational rehabilitation. From these components arise "four distinct classes of benefits: TD [temporary disability]; VRTD [vocational rehabilitation temporary disability]; VRMA [vocational rehabilitation maintenance allowance]; and PD [permanent disability]." (*Kopitske v. Workers' Comp. Appeals Bd.* (1999) 74 Cal.App.4th 623, 630 [88 Cal.Rptr.2d 216] (*Kopitske*).)[2] Before delving into what these various forms of assistance are, and the differences and similarities between and among them, we will briefly discuss, in general terms, the intended purpose behind the compensation scheme's key components.

## B. *Disability Indemnity—Temporary Disability and Permanent Disability*

The purpose of temporary disability indemnity is to provide interim wage replacement assistance to an injured worker during the period he or she is healing. (*Kopitske, supra,* 74 Cal.App.4th at p. 630.) Depending on the

---

[2] We note the parties and some of the cases use acronyms extensively when discussing the various benefits. For the sake of clarity and to avoid confusion, the only acronyms we will use in this opinion are VRTD for Vocational Rehabilitation Temporary Disability and VRMA for Vocational Rehabilitation Maintenance Allowance benefits.

severity of the injury, workers can be deemed partially or totally temporarily disabled and will receive temporary disability until they recover or become permanently disabled. (Lab. Code, §§ 4650, 4653–4658; *Jimenez v. Workers' Comp. Appeals Bd.* (1991) 1 Cal.App.4th 61, 63 [1 Cal.Rptr.2d 660] (*Jimenez*).)[3]

"Once the employee's condition has become permanent and stationary, he or she is entitled to permanent disability indemnity; these benefits are intended as reimbursement for the employee's impaired future earning capacity or decreased ability to compete in the open labor market. [Citation.]" (*Ritchie v. Workers' Comp. Appeals Bd.* (1994) 24 Cal.App.4th 1174, 1179–1180 [29 Cal.Rptr.2d 722] (*Ritchie*).) Permanent disability is expressed in percentages, and if a disability is deemed less than 100 percent, it is referred to as a permanent partial disability. (1 Cal. Workers' Compensation Practice (Cont.Ed.Bar 4th ed. 2005) Permanent Disability, § 5.1, p. 276.)[4] The amount of compensation payable for a given percentage of permanent disability varies according to the date of injury. (*Id.*, § 5.8, at p. 285.)

"The distinction between compensation for wage loss [temporary disability] and permanent impairment is well established. In *Nickelsberg v. Workers' Comp. Appeals Bd.* (1991) 54 Cal.3d 288, 294 [285 Cal.Rptr. 86, 814 P.2d 1328], the California Supreme Court reiterated in another context the fundamental distinctions, under the California workers' compensation system, of benefits compensating for wage loss, providing medical treatment, and compensating for bodily impairment. Permanent disability indemnity is awarded injured workers in California in lieu of tort damages against employers." (*Appleby v. Workers' Comp. Appeals Bd.* (1994) 27 Cal.App.4th 184, 194 [32 Cal.Rptr.2d 375] (*Appleby*).)

## C. *Vocational Rehabilitation—The Return-to-work Program*

■ If a worker is precluded, or anticipated to be precluded, from returning to his or her former position due to an industrial injury, it is in the public's and the worker's best interest for him or her to return to the labor force in a different position that accommodates the worker's disability. So, it is not surprising the compensation laws also currently include provisions for the payment of vocational rehabilitation. (§ 139.5, subd. (k) [for workers injured before January 1, 2004].)

---

[3] All further statutory references are to the Labor Code, unless otherwise indicated.

[4] In this case, Gamble was found to be 60 percent permanently disabled. In 2001, he entered a stipulation permanent disability indemnity was "payable at $170.00 per week beginning [March 2, 2000], in the sum of $58,862.50, less credit for such payments previously made." Gamble's permanent disability award is not challenged, and accordingly, is not discussed at any significant length in this opinion.

The purpose of vocational rehabilitation is " 'to restore the worker to as near his or her previous income-producing status as can be reasonably and properly done.' [Citation.]" (*Ritchie, supra,* 24 Cal.App.4th at p. 1180.) "The law encourages the injured worker to engage in rehabilitation. In fact the term 'compensation' is now defined to include vocational rehabilitation benefits." (*Jimenez, supra,* 1 Cal.App.4th at pp. 63–64; § 3207.)

"In the case of a worker who will be unable to return to his or her former job due to industrial injury, rehabilitation benefits consist of the costs of vocational training, counseling, and guidance, as well as certain additional living expenses, all for the purpose of preparing and adapting the worker to perform a new job or trade and enter a new work environment. [Citation.]" (*Ritchie, supra,* 24 Cal.App.4th at p. 1180.) "Additional living expenses include, but are not limited to, reasonable costs for food, lodging, transportation, clothing, and dependent care. [Cal. Code Regs., tit. 8, § 10125.2 (Adm Dir Rules.)]." (1 Cal. Workers' Compensation Practice, *supra,* § 6.121, at pp. 451–452.)

An employer is required to provide vocational rehabilitation "[w]hen an employee is determined to be medically eligible[,]" i.e., a qualified injured worker. (§ 139.5, subd. (c)). Historically, a qualified injured worker must meet two criteria: (1) medical eligibility; and (2) vocational feasibility. Medical eligibility contemplates the injured worker will be permanently precluded from returning to his or her usual occupation or position held at the time of the injury. (1 Cal. Workers' Compensation Practice, *supra,* § 6.23, at p. 375.) The vocational feasibility requirement relates to the question of whether rehabilitation services would help the worker "return to suitable gainful employment." (*Id.* § 6.31, at p. 383.) This requires evaluation of the employee's qualifications, interests, aptitudes, and earning capacity, as well as, the labor market and the type of disability. (*Ibid.*)

### D. *Statutory History of Section 139.5*

The definition, scope, and limits of vocational rehabilitation benefits are contained in section 139.5. A discussion of this provision's evolution is helpful to gain insight as to why rehabilitation services will differ depending on the particular circumstances of the injured worker.

Section 139.5, subdivision (c), was first enacted in 1965, and made the employer's initiation of and the employee's participation in the rehabilitation program voluntary. (*Ritchie, supra,* 24 Cal.App.4th at p. 1181.) In 1975, the statutory provision was amended to make rehabilitation programs mandatory for employers and to expressly authorize the continuation of temporary disability indemnity payments during rehabilitation. (*Ibid.*) "The Legislature

envisioned vocational rehabilitation as a service to be provided before disability becomes stationary." (*Webb v. Workers' Comp. Appeals Bd.* (1980) 28 Cal.3d 621, 634 [170 Cal.Rptr. 32, 620 P.2d 618].)

Consequently, after the 1975 amendment, "a qualified injured worker who enrolled in a rehabilitation program continued to receive [temporary disability], as well as benefits such as additional living expenses necessitated by the [vocational rehabilitation] program. (Former § 139.5, subd. (c), Stats. 1982, ch. 922, § 2, p. 3364.) Temporary disability indemnity received in conjunction with a vocational rehabilitation program is sometimes referred to as 'VRTD' to distinguish it from medical TD [temporary disability] received outside a rehabilitation program." (*Jimenez, supra,* 1 Cal.App.4th at pp. 63–64.)

However, it soon became apparent vocational rehabilitation services frequently did not commence until after the disability had become permanent. This prompted the Legislature to amend section 139.5 "in 1989 to provide for the payment of a 'maintenance allowance' benefit" for those workers already deemed permanently disabled, i.e., the creation of VRMA. (*Ritchie, supra,* 24 Cal.App.4th at p. 1182.) It was specified that "[i]n no event shall temporary disability indemnity and maintenance allowance be payable concurrently." (§ 139.5, subd. (d)(2).) The new maintenance allowance took effect January 1, 1990.

■ To summarize, under the 1989 amendment, an injured worker who is medically eligible may choose to enroll and receive vocational rehabilitation services while also receiving temporary disability indemnity. When the worker's medical condition becomes permanent and stationary, he or she may continue with vocational rehabilitation services. However, temporary disability indemnity payments must cease, and the worker may receive a section 139.5 maintenance allowance, permanent disability indemnity, or a combination of both if the total sum does not exceed the maximum payment limit (discussed in more detail anon). (§ 139.5, subd. (c).)

The maintenance allowance is measured at two-thirds of the worker's average weekly earnings at the date of the injury. (§ 139.5, subd. (d)(2).) However, the maximum payment is capped at $246 a week, which is a much lower maximum rate than permitted for workers receiving temporary disability or VRTD. (§ 139.5, subd. (d)(1); *Jimenez, supra,* 1 Cal.App.4th at p. 64, fn. omitted.)[5] It is believed the Legislature created this discrepancy "to provide an incentive to the injured worker to quickly complete vocational rehabilitation" while he or she is still temporarily disabled. (*Ritchie, supra,* 24 Cal.App.4th at p. 1183.)

---

[5] To put this figure in context, the maximum rate for a worker receiving temporary disability in 1999 was $735.

In 1993, section 139.5 was amended once more to impose additional monetary restrictions on VRMA benefits. For example, the Legislature placed a cap on the length of time (52 weeks) and the total amount of money spent ($16,000). (§ 139.5, subd. (c).) Notably, the Legislature expressly *excluded* workers receiving VRTD from this same time and payment limitations. Again, it was believed the new limitations would encourage injured workers to enroll in rehabilitation as soon as possible, while still medically temporarily disabled, to avoid receiving less money and services when permanently disabled. (See *Ritchie, supra,* 24 Cal.App.4th at p. 1185.)

Ten years later, the Legislature decided to scrap the entire vocational rehabilitation program, and repealed section 139.5. However, within three months, the section was reenacted to accommodate injured workers already enrolled in the program. Consequently, section 139.5 now has limited application to workers injured before January 1, 2004, and the program will expire on January 1, 2009, unless a new statute is enacted extending the benefit. (§ 139.5, subds. (k), (*l*).)

## II. Factual and Procedural Background

Keeping in mind the background and evolution of the compensation scheme, we turn to the particulars of this case. The parties do not dispute the underlying facts. After 22 years of employment with United as an air freight agent, Gamble injured his back. At the time of his injury, Gamble was also working for the School District, where he had been employed for 27 years. Although the injury precluded him from continuing his labor-intensive job at United, Gamble was able to continue working as a teacher and dean with the School District. In January 2001, the parties stipulated to a permanent disability indemnity award and Gamble's right to various benefits. Thereafter, a dispute arose over Gamble's claim for VRMA benefits.

### A. Gamble's Application for VRMA benefits

After stipulating to a permanent disability indemnity payment, Gamble applied for vocational rehabilitation benefits. The Vocational Rehabilitation Unit (the Unit), which oversees all aspects of vocational rehabilitation (§ 139.5, subd. (a)), determined Gamble was a qualified injured worker, and therefore, eligible to receive VRMA benefits. United disputed Gamble's designation as a qualified injured worker and disputed his eligibility for VRMA benefits. It asserted that if these benefits were awarded, it was entitled to pay Gamble the maintenance allowance component "on a wage-loss basis" and receive a credit for Gamble's School District wages.

A hearing was held in July 2003, and on November 9, 2003, the Workers' Compensation Administrative Law Judge, Honorable Jules L. Greenberg,

issued his "Findings and Order" and his "Opinion on Decision." Giving the Unit's determination the great weight to which it was entitled, Judge Greenberg denied United's appeal and found Gamble was a qualified injured worker entitled to vocational rehabilitation benefits and services. The judge also concluded the January 2001 stipulation resolved all claims for any past VRMA owed, but Gamble was entitled to these rehabilitation benefits after the date of the stipulation. United was ordered to provide the services requested. In the order, Judge Greenberg added United was "entitled to *assert* its credit for wages paid to the applicant as part of applicant's concurrent employment with the [School District]." (Italics and underscoring added.)

B. *Gamble's Petition for Reconsideration*

Gamble petitioned the Board for reconsideration of Judge Greenberg's decision. Before the hearing, Judge Greenberg issued a "Judge's Recommendation on Petition for Reconsideration." Rather than address the issues for the benefit of the Board, the judge rescinded his November 9, 2003, ruling and set a new hearing. Judge Greenberg explained the action was warranted to "allow for time to consider carefully the arguments advanced by the applicant in his petition, which also appear to have some merit." The judge noted the inconsistency between the "Opinion on Decision" which stated United "would be *entitled* to credit" and his "Finding and Order" that stated United was "entitled only to *assert* its right to credit." (Italics added.)

At the hearing, the parties discussed the credit issue and resubmitted the matter on the existing record. A new "Findings and Order" was issued on July 19, 2004. Gamble was again determined to be a qualified injured worker who was entitled to VRMA benefits after the date of the January 2001 stipulation. In addition, United was ordered to provide these benefits and expressly denied a credit for Gamble's School District wages. The "Opinion on Decision" was issued in conjunction with the new "Findings and Order."

Judge Greenberg's written opinion contained much of the same reasoning as the previous one, but also included a discussion of VRMA benefits and an employer's right to an offset. He noted, there was unrebutted trial testimony Gamble and his family were dependent on his two incomes, and concluded Gamble should not be penalized for his continuing work in a much less physically demanding occupation with the School District. In addition, Judge Greenberg concluded Gamble was entitled to receive the maintenance allowance to allow him to successfully complete a rehabilitation plan and pursue another second employment consistent with his stated desire.

C. *United's Petition for Reconsideration*

United petitioned the Board for reconsideration of the July 2004 decision. United again disputed Gamble was a qualified injured worker and reasserted

it should be given credit for wages earned by Gamble at the School District. Judge Greenberg submitted a thorough six-page, "Judge's Report on Petition for Reconsideration" recommending denial of United's petition. In the report, he included a procedural history of the case, a statement of the issues, a lengthy discussion of the law, and his reasoning for denying United a credit.

The Board granted United's petition for reconsideration. It reaffirmed Judge Greenberg's finding Gamble was a qualified injured worker entitled to VRMA benefits. However, it amended the "Findings and Orders" to allow United a credit "for wages" paid to Gamble by the School District "on a wage-loss basis." It is from this decision Gamble seeks appellate review.

### III.  The Credit Issue

The sole issue raised by Gamble's petition is a challenge to the Board's award of a credit "on a wage-loss basis" against his VRMA benefits due solely to his concurrent employment with the School District. United did not file a petition to challenge the Board's determination Gamble was a qualified injured worker or its finding Gamble was entitled to receive VRMA benefits.

### A.  Board's Opinion and Order

In its opinion and order, the Board stated there were cases indicating an employer is entitled to credit for amounts an injured worker earned while also receiving vocational rehabilitation. The Board also specifically noted, and attached significance to, the fact Gamble failed to prove he looked for a second job in the past four years. The Board recited Gamble's testimony he believed he "may be able" to find work as a reservations clerk for a different airline. The Board concluded that rather than looking for work with another employer, the record showed Gamble waited to see if United would allow him to come back as a reservation clerk or give him early retirement. In addition, the Board observed a second job did not seem feasible, stating, "It is not at all obvious how [Gamble] could be available for rehabilitation services while he is working full-time for the [School District] as an educator and as dean of students."

We conclude the factual circumstances discussed by the Board are relevant only to the question of whether Gamble could satisfy the vocational feasibility requirement to be deemed a qualified injured worker. Those facts have no bearing on the credit issue. Moreover, we conclude the Board misinterpreted the applicable law concerning an employer's right to receive a credit "for wages" when calculating the *monetary allowance* component for living expenses and costs incurred by a vocational rehabilitation recipient.

B. *Standard of Review*

We are bound by the Board's factual findings and decision if supported by substantial evidence. (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 233 [20 Cal.Rptr.2d 26].) We "may not reweigh evidence or decide disputed . . . fact[s]." (*Ibid.*) On the other hand, interpretation of governing statutes is decided de novo by the appellate court, even though the Board's construction is entitled to great weight unless clearly erroneous. (*Boehm & Associates v. Workers' Comp. Appeals Bd.* (1999) 76 Cal.App.4th 513, 515–516 [90 Cal.Rptr.2d 486].)

C. *Case Authority Discussing Credits "For Wages"*

The parties agree there is no explicit authority that provides an employer may receive a credit against the VRMA benefits owed to a permanently disabled worker simply because he continued to receive wages from a second job. United advances several theories for its entitlement to a wage credit based on cases discussing the credit issue in other contexts. We have carefully reviewed this authority, and conclude none are sufficiently analogous to be controlling here.

Instead, we found the Legislature has clearly designated specific formulas to be applied when calculating each category of compensation benefits, including VRMA benefits. Below, we will discuss the statutory-based calculations used for each kind of benefit, demonstrating the wage credit concept applies only in limited circumstances involving temporarily disabled workers and is not applicable here.

■ Looking first at permanent disability indemnity, we found the wage credit concept does *not* apply when calculating payments (regardless of whether the worker is totally or partially permanently disabled). As mentioned earlier, compensation for permanent disability indemnity relates "to the employee's diminished ability to compete in an open labor market *rather than to whether a wage loss* was being incurred at the time the disability became permanent and stationary." (1 Cal. Workers' Compensation Practice, *supra*, § 5.6, at p. 279, italics added.) Consequently, the payment scheme contained in sections 4453 and 4659 only takes into account the year of injury and the percentage of disability. (See § 4453.)

Moreover, "It is settled law in this state that an employe[e] may receive a permanent disability rating of 100 [percent] and be entitled to the disability payments incident to such rating although he is able to return to work at the wages he received before the injury which caused disability. '[T]he right to compensation is not lost or diminished by the injured employee's return to

work at the same or a different wage than that theretofore earned by him. The statute does not require a showing of loss of earning power as a prerequisite to the payment of compensation for a permanent disability, but, on the contrary, provides for the payment in installments of a fixed and definite sum of money therefor.' [Citations.]" (*Smith v. Industrial Acc. Com.* (1955) 44 Cal.2d 364, 367 [282 P.2d 64].) Thus, it is "unnecessary for the [injured] employee to have a current wage loss in order to be entitled to permanent disability payments." (1 Cal. Workers' Compensation Practice, *supra*, § 5.6, at p. 279.) For this reason, there is no dispute Gamble's permanent disability indemnity payment is unaffected by his wages from the School District.

■ The formulas used for temporary disability indemnity payments are more complicated. Different calculations must be applied depending on whether the worker is (1) *totally* temporarily disabled and unable to continue working, versus (2) *partially* temporarily disabled, and may be able to work a reduced number of hours or at an alternative lower-paying position.

The starting point for both kinds of workers is the measurement of his or her average weekly earnings (AWE), which is a concept defined by statute. Section 4453, subdivision (c), provides several different methods for computing the AWE depending on whether the employee has more than one employer, works less than 30 hours a week, or is paid at a regular and constant rate. Generally, when a worker has more than one employer, the AWE is the total of all weekly earnings capped at the rate earned on the job in which the employee was injured. The computation can change depending on the hours worked at each employment and whether it produces a fair and reasonable result. (See § 4453, subd. (c).)

The payment given to a temporarily *totally* disabled worker (like payments for the permanently disabled) does not contemplate a wage credit because the worker is not expected to be capable of earning supplemental wages. The formula applied is simply two-thirds of the worker's AWE at the date of injury. (§ 4453, subd. (a)(7) [subject to a maximum of $735 for workers injured in 1999 (when Gamble was injured)].)

■ However, the payment made to a temporarily *partially* disabled worker must take into account wages earned (or expected to be earned) by the worker in an alternative lower paying job. Such benefits are "often called the 'wage-loss' benefit, because it pays a portion of the earnings that the injured worker loses" during the period of healing (or until their condition become permanent or stationary). (1 Cal. Workers' Compensation Practice, *supra*, § 4.2, at p. 228.) Stated another way, employers of these workers are given a credit for any wages earned by the employee able to work less hours or at a lower paying position.

Section 4657 delineates the formula to calculate the "loss in wages" for the temporarily partially disabled worker. The payment equates to the difference "between the [AWE] of the injured employee and the weekly amount which the injured employee will probably be able to earn during the disability, to be determined in view of the nature and extent of the injury. . . ."[6]

Not surprisingly, this same "loss in wages" credit formula applies when calculating the temporary disability indemnity component of a worker also receiving vocational rehabilitation services. In other words, workers receiving VRTD benefits can participate in vocational rehabilitation programs while continuing to collect temporary disability indemnity payments calculated on a "wage-loss basis." (§ 4657.)

This category of benefits was discussed in the two California Compensation cases cited by United and the Board: *County Sanitation District of Los Angeles v. Workers' Comp. Appeals Bd.* (1995) 60 Cal.Comp.Cases 618 *(Reyes)* and *Douglas v. Workers' Comp. Appeals Bd.* (1982) 47 Cal.Comp.Cases 932 *(Wiley).*

█ In *Reyes,* the court recognized that to receive VRTD benefits an injured worker must meet the following requirements: (1) he or she is deemed a qualified injured worker justifying rehabilitation services; and (2) the worker continues to show a current wage loss in order to receive temporary disability indemnity payments. *(Reyes, supra,* 60 Cal.Comp.Cases at pp. 619–620.)

Cesar Reyes, a sanitation worker, "suffered a work-related injury to his psyche." *(Reyes, supra,* 60 Cal.Comp.Cases at p. 619.) He was denied retroactive VRTD benefits after the workers' compensation judge determined he failed to satisfy the vocational feasibility criteria to be a qualified injured worker. The judge relied on the fact Reyes started working as a self-employed salesman "in his own office sales enterprise" the same year he claimed to be injured at his job with the sanitation district. *(Ibid.)* The judge reasoned, "[H]e should not be entitled to rehabilitation benefits during the evaluation process since he had already returned to suitable gainful employment." *(Ibid.)*

---

[6] If a totally disabled employee collecting temporary disability indemnity obtains new employment, he or she must immediately notify the employer who is making the payment. (See § 3820.) If the work is for fewer hours or at a lower paying job, the indemnity payment will be recalculated using the "weekly loss in wages" formula described above: The payment is two-thirds of his or her "weekly loss in wages," which consists of the difference between the worker's AWE and the weekly amount the employee can earn during the disability. (See § 4657.)

The Board granted Reyes's petition for reconsideration and affirmed the prior decision Reyes did not meet the criteria to be deemed a qualified injured worker status. However, the Board held Reyes was entitled to retroactive VRTD benefits during the evaluation period because "there was prima facie evidence of eligibility and good faith issues existed as to [his qualified injured worker] status." (*Reyes, supra,* 60 Cal.Comp.Cases at p. 619, relying on *Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1985) 165 Cal.App.3d 633 [211 Cal.Rptr. 683] [applicant ultimately determined not to be Qualified Injured Worker was found to be entitled to some VRTD benefits].) The Board explained, "[T]he amount to be awarded should be calculated on a wage-loss basis because [Reyes] did have some earnings during the relevant evaluation period." (*Reyes, supra,* 60 Cal.Comp.Cases at pp. 619–620.) It recognized the temporary disability component of the VRTD benefits is measured on a wage-loss basis and the employer should be credited for wages earned, if any, by new supplemental employment.

Similarly, in *Wiley*, the Board applied a credit on VRTD benefits on a wage-loss basis for the commissions the injured worker earned from insurance policies "sold during Wiley's *temporary disability*." (*Wiley, supra,* 47 Cal.Comp.Cases at p. 933, italics added.) Unlike the worker in *Reyes,* William Wiley was working concurrently at two different jobs. He sustained a back injury while employed as a truck driver, but it did not prevent him from continuing his work as an independent agent selling insurance. (*Ibid.*) While receiving temporary disability, Wiley sought rehabilitation services because he was not interested in pursuing insurance work on a full-time basis. It was undisputed Wiley was a qualified injured worker, and "he had not been provided with suitable gainful employment." (*Ibid.*) The Board reasoned, "Wiley was entitled to rehabilitation benefits because, regardless of his income from insurance work, it is undisputed his total income was lowered by virtue of his inability to drive a truck." (*Ibid.*)

The Board also noted that although the trucking employer was entitled to a credit for income earned on new policies sold during Wiley's disability, the employer "was not entitled to a credit for renewal premiums because commissions on renewals could not be considered a current wage." (*Wiley, supra,* 47 Cal.Comp.Cases at p. 933.)

Thus, to summarize, the Board held Wiley was entitled to VRTD benefits comprised of (1) vocational rehabilitation services because he met the

requirements of a qualified injured worker; and (2) continuation of *temporary disability indemnity payments* based on his weekly loss earnings (the difference between his AWE and the current weekly wage earned on new policies sold). (*Wiley, supra,* 47 Cal.Comp.Cases at p. 933.)

### D. *No Wage Credit for VRMA Benefits*

United argues the same rationale applied in *Reyes* and *Wiley* should apply to a worker falling under the VRMA benefit scheme. It maintains VRTD and VRMA benefits play essentially the same role in the scheme: Both are forms of temporary compensation. But United overlooks the fact the Legislature designed different formulas for calculating payments due to injured workers falling within these two benefit categories.

As discussed above, the Legislature determined the temporary disability indemnity component of VRTD must be based on a wage-loss formula found in section 4657. However, the Legislature specified the maintenance allowance given to a permanently disabled worker (VRMA) "shall be two-thirds of the employee's [AWE] at the date of injury." (§ 139.5, subd. (d).) The latter does not contemplate a wage credit for employers because it is not intended to replace lost earnings. Rather, it is one of many components of the array of vocational rehabilitation services available to qualifying, permanently disabled workers.

United apparently overlooks the fact the maintenance allowance is only available to workers deemed permanently disabled. Indeed, section 139.5, subdivision (c), explicitly states that once a worker is permanent and stationary, the payment of temporary disability indemnity ceases and is replaced with the payment of a *different benefit* called "maintenance allowance."

The maintenance allowance payment is measured in the same way as permanent disability indemnity payments. It is a preestablished fraction of the worker's AWE *at the date of injury.* Section 139.5 also sets a maximum limit for the amount of maintenance allowance permitted using the AWE based formula.[7] If the Legislature had intended the maintenance allowance to also be reduced by wages earned, it could have used similar language found in section 4657 (containing the wage-loss formula for temporarily partially disabled workers). We cannot rewrite section 139.5 to include it.

---

[7] The maintenance allowance is defined as, "The amount the employee would have received as continuing temporary disability indemnity," but with a maximum of $246 per week. (§ 139.5, subd. (d)(1).)

■ We note the Legislature recognized the maintenance allowance would likely be small in comparison to what the worker was awarded for permanent disability indemnity. The worker receiving VRMA benefits can supplement the maintenance allowance with "an additional amount from permanent disability indemnity due or payable, sufficient to provide the employee with a maintenance allowance equal to two-thirds of the employee's [AWE] at the date of injury subject to the limits specified in subdivision (a) of section 4453 . . . ." (§ 139.5, subd. (d)(2).) In other words, the worker has the option of combining the maintenance allowance with permanent disability benefits so long as the total combined payment does not exceed what a worker receives under VRTD benefits.[8] Very telling is the Legislature's decision to set the maximum payment allowable for this combination of benefits by referring to section 4453 (used for measuring permanent disability limits), with no reference to the wage credit reduction formula found in section 4657. What would be the point of supplementing the maintenance allowance with permanent disability indemnity if an employer could reduce the total amount to zero?

■ We are required, as is the Board, under section 3202 to liberally construe the workers' compensation provisions of the code "with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (*Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 726 [100 Cal.Rptr. 301, 493 P.2d 1165].) We first look to the plain meaning of the statutory language, when clear and unambiguous. (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387–388 [20 Cal.Rptr.2d 523, 853 P.2d 978].) Effect also should be given to the statute's every word and clause, thereby leaving no part or provision useless, deprived of meaning, or contradictory. (*Id.* at p. 388.) Finally, the statute should be interpreted consistently with its intended purpose, and harmonized within " 'the statutory framework as a whole.' " (*Ibid.*)

■ In light of the above, we conclude that when the Legislature amended section 139.5 to create the maintenance allowance component for permanently disabled workers, it clearly and unambiguously determined the payment would be less than what a temporarily disabled worker would receive and, more importantly, would be based on a preset fraction of the worker's AWE. It was foreseeable that permanently disabled workers could

---

[8] For the sake of comparison, a temporarily totally disabled worker receiving VRTD is capped at $735 per week. If this same hypothetical worker was temporarily partially disabled and receiving VRTD, the maximum he or she receives would be the difference between the AWE maximum limit ($735) minus the wages currently being earned under the "loss in wages" formula. (See § 4657.) Whereas, a permanently disabled worker receiving VRMA is capped at $246 unless the worker chooses to supplement with a payable PD indemnity award (with a maximum limit of $735).

be collecting permanent disability indemnity as well as income from secondary employment. Yet, nowhere in section 139.5 is there any indication the Legislature contemplated a credit for wages to employers paying the maintenance allowance. Just as Gamble can supplement the maintenance allowance with permanent disability payments without fear of losing it, he can continue to earn wages from the School District while seeking under the VRMA benefit scheme a second job to replace his United air freight employment.

### E. *Limited Applicability of Section 4909*

As an alternative argument, United asserts it is entitled to a credit "for wages" pursuant to section 4909. It misunderstands the purpose and scope this provision.

■ "[S]ection 4909, as interpreted by the California courts, was intended to encourage employers to make *voluntary* payments to injured employees and obtain a *subsequent reduction* in the amount determined to be due the employee." (*Appleby, supra,* 27 Cal.App.4th at p. 191, italics added.) Stated another way, if an employer makes payments that exceed what was actually owed, the Board has the discretion to consider such payments when later calculating the amount of compensation to be paid.

For example, an employer may receive a credit against an employee's permanent disability award for voluntary payments made pursuant to the employer's private benefit plan when such " 'payments were clearly intended by both the employer and the employee as an advance on compensation to become due.' " (*Appleby, supra,* 27 Cal.App.4th at p. 192, quoting *Ott v. Workers' Comp. Appeals Bd.* (1981) 118 Cal.App.3d 912, 921–922 [173 Cal.Rptr. 648].) In addition, section 4909 will be applied to avoid double recovery in concurrent jurisdiction situations, because awards under one compensation system are credited against a recovery under the second system. (See, e.g., *Sea-Land Service, Inc. v. Workers' Comp. Appeals Bd.* (1996) 14 Cal.4th 76, 86–87 [58 Cal.Rptr.2d 190, 925 P.2d 1309] [employer entitled to a credit against workers' compensation payments for federal maritime benefits paid]; *California Comp. Ins. Co. v. Ind. Acc. Com.* (1954) 128 Cal.App.2d 797, 807 [276 P.2d 148] [worker's compensation should be reduced if injured worker also collecting unemployment insurance benefits].)

Relying on *Hupp v. Workers' Comp. Appeals Bd.* (1995) 39 Cal.App.4th 84 [45 Cal.Rptr.2d 859] (*Hupp*) and *Kosowski v. Workers' Comp. Appeals Bd.* (1985) 170 Cal.App.3d 632 [216 Cal.Rptr. 280] (*Kosowski*), United asserts it is entitled to a credit for wages earned before Gamble receives his VRMA benefits. It fails to mention *Hupp* and *Kosowski* concern unique workers' compensation benefits given only to injured peace officers, firefighters,

specified law enforcement, and other safety members described in sections 4850 and 4853. Under that special benefit scheme, the injured worker is entitled "to a leave of absence . . . without loss of salary in lieu of temporary disability payments or maintenance allowance payments under [s]ection 139.5, if any," for one year or until retirement on a disability pension. (§ 4850, subd. (a).) The extra benefit is intended to compensate certain public employees in high-risk jobs. (See *City of Martinez v. Workers' Comp. Appeals Bd.* (2000) 85 Cal.App.4th 601, 614 [102 Cal.Rptr.2d 588] (*City of Martinez*).)

"If the disability continues beyond one year, the [eligible public employee] is entitled to a continued unpaid leave of absence until retirement and also is permitted to secure whatever regular workers' compensation benefits may be available. [Citation.] . . . [Citation.] Payments made under section 4850 are considered workers' compensation benefits, not salary. [Citation.]" (*City of Martinez, supra,* 85 Cal.App.4th at p. 614.)

The *Hupp* and *Kosowski* courts held an employer paying full salary in lieu of temporary disability indemnity under section 4850 may be entitled to credit limited to net income from a disabled worker's self-employment. In *Hupp*, an injured deputy sheriff "earned additional outside income by giving music lessons, playing his musical instrument, and servicing musical equipment prior to his disability. He continued this self-employment after becoming disabled." (*Hupp, supra,* 39 Cal.App.4th at p. 86.) Similarly, in *Kosowski* an injured firefighter "started selling used cars as an investment and hobby prior to his injury and obtained a license to operate a used car dealership in partnership with his wife." (*Kosowski, supra,* 170 Cal.App.3d at p. 635.)

These courts recognized the rule stating compensation may not be reduced "by an insurance, contribution or other benefit due to or received by the person entitled to such compensation. (§ 3752.) Credit will be allowed the employer, however, for amounts earned by the injured worker while the worker is being paid *total* temporary disability. [Citation.]" (*Kosowski, supra,* 170 Cal.App.3d at p. 636, italics added; see also § 4909.) The *Kosowski* court determined (and the *Hupp* court agreed), workers receiving special section 4850 benefits were comparable to temporarily totally disabled workers. Consequently, pursuant to section 4909, the Board had authority "to allow a credit against section 4850 benefits." (See *Kosowski, supra,* 170 Cal.App.3d at p. 635.) We fail to see how these cases have any bearing on the question of Gamble's entitlement to VRMA benefits.

Although it is not discussed in *Hupp or Kosowski,* we recognize a permanently injured worker who qualifies under section 4850 can collect up to one year of full wages in lieu of "maintenance allowance payments under [s]ection 139.5." (§ 4850, subd. (a).) For example, a police officer deemed

permanently disabled can "continue[] to receive section 4850 benefits through the covered period while other employees will receive the reduced maintenance allowance payments under section 139.5, [subdivision] (c)[,] during vocational rehabilitation." (*City of Martinez, supra,* 85 Cal.App.4th at pp. 617–618.) Applying the rational of *Hupp* and *Kosowski,* an employer's overpayment of salary made in lieu of a maintenance allowance, due to the employee's gainful self-employment, may be credited back to the employer.

However, United has not made an overpayment of the special section 4850 benefits. Gamble falls in the category of the permanent employees who are only eligible to receive the reduced maintenance allowance payments under section 139.5, subdivision (c). The discussion in *Hupp* and *Kosowski* of a credit for wages is limited to the context of an employee receiving his full salary under section 4850. There is no logical reason to extend the holdings of these cases to other benefit schemes. We note United failed to offer any rationale for comparison, or any meaningful analysis on the issue. It was United's burden of proof to establish entitlement to credit. (Evid. Code, § 500; see also *Ott v. Workers' Comp. Appeals Bd., supra,* 118 Cal.App.3d at pp. 921–922.)

## IV. Disposition

We have concluded a credit for wages is not contemplated by section 139.5. The maintenance allowance prescribed by that section is not intended to replace lost wages, and affording United a credit for wages Gamble currently earns at the School District would unjustly enrich United. There is no double recovery issue with respect to those wages, payments, and services owed during vocational rehabilitation, or his permanent disability indemnity payments.

Simply stated, Gamble is entitled to all components of VRMA benefits because he a qualified injured worker. VRMA benefits can terminate if he secures alternative work offered by United or another employer. (See former § 4644, subd. (a) [listing reasons VRMA may be terminated].)[9] Wages earned at a job that preexisted and coexisted with his employment at United is not grounds for refusing VRMA benefits.

---

[9] United's liability can terminate if Gamble: (1) completes a rehabilitation plan (former § 4644, subd. (a)(2)); (2) unreasonably fails to participate in the plan (former § 4644, subd. (a)(1)); (3) accepts or rejects alternative work by United that meets the requirements of former section 4644, subdivision (a)(5); (4) accepts work lasting 12 months (former § 4644, subd. (a)(6)(B)); or (5) settles his claims with United and agrees on a self-directed vocational rehabilitation program (former § 4644, subd. (a)(8)).

Accordingly, we find the Board improperly construed the applicable statutory provisions and incorrectly determined, pursuant to inapt case authority relating to other benefit provisions, that United was entitled to a credit "for wages" against the maintenance allowance component of Gamble's vocational rehabilitation benefits. The Order and Decision after Reconsideration of the Board to "allow credit for wages paid on a wage-loss basis" is annulled. The matter is remanded to the Board for further proceedings consistent with the views expressed in this opinion. Costs are awarded to petitioner.

Rylaarsdam, Acting P. J., and Ikola, J., concurred.

On September 26, 2006, the opinion was modified to read as printed above.