169 Cal.App.4th 232 (2008)
HERTZ CORPORATION, Petitioner,
v.
WORKERS' COMPENSATION APPEALS BOARD and MANUEL AGUILAR, Respondents.
No. H032438.
Court of Appeals of California, Sixth District.
December 16, 2008.
*236 D'Andre, Peterson, Bobus, Bruscino & Rosenberg and Robert J. Succa for Petitioner.
No appearance for Respondent Workers' Compensation Appeals Board.
Dennis D. Olson for Respondent Manual Aguilar.

OPINION
BAMATTRE-MANOUKIAN, Acting P. J. 

INTRODUCTION
Respondent Manuel Aguilar sustained specific and cumulative injuries to both of his knees, shoulders and wrists, and to his right ankle while working *237 as an auto washer for petitioner Hertz Corporation (Hertz). Due to Aguilar's injuries and his inability to read and write English, the workers' compensation judge (WCJ) found him to be non-feasible for vocational rehabilitation and thus permanently totally disabled. Respondent Workers' Compensation Appeals Board (the Board) affirmed the WCJ's decision and award. Hertz petitions for review of the Board's decision, contending that an employer should not be liable for permanent total disability benefits when an injured worker's inability to participate in rehabilitation is due, in part, to nonindustrial causes.
In analyzing Hertz's claim we first determine that Aguilar's permanent disability should be rated using the 1997 rating schedule rather than the 2005 rating schedule. We then determine that a finding of permanent total disability is not appropriate in this case. Under our revised worker's compensation system, even when the 1997 rating schedule is used, an employer is liable for only the portion of an injured worker's permanent disability that is directly caused by the industrial injury. The finding of permanent total disability in Aguilar's case is based in part on the finding that vocational rehabilitation is not feasible, and the finding of nonfeasibility is due in part to preexisting nonindustrial factors. Therefore, we conclude that Hertz is not liable for that portion of Aguilar's permanent disability that is caused by preexisting nonindustrial factors. We will reverse the decision of the Board and remand the matter for a redetermination of Aguilar's permanent disability rating.

BACKGROUND
Aguilar was born in Mexico in 1955, and lived there until approximately 1980, when he came to this country. In 1984 or 1985, he obtained employment with Hertz as an auto washer, regularly working 80 hours a week. He was working in that capacity when he sustained a specific injury to his left knee on March 21, 2000, a cumulative injury to both wrists and shoulders and his right ankle from January 29, 2001, through January 29, 2002, and a specific injury to his right knee on November 4, 2001. He received medical treatment, including surgery, for his injuries, and temporary disability indemnity during broken periods beginning May 8, 2001. He last worked on January 29, 2002. He filed three separate applications for adjudication of his workers' compensation claim for permanent disability indemnity, the first for the left knee injury (SJO226456), the second for the cumulative shoulder, wrist and ankle injuries (SJO228891), and the third for the right knee injury (SJO235420). He also requested vocational rehabilitation services.
On August 15, 2005, Dr. Gordon Levin submitted a report finding that Aguilar's injuries were permanent and stationary, so Aguilar was referred to The Simon Group for vocational rehabilitation services. On January 20, 2006, *238 Aguilar's rehabilitation counselor at The Simon Group issued a report stating in pertinent part: "Mr. Aguilar presents as someone who describes himself as in chronic pain, both with respect to the bilateral upper extremities and both of his legs. Therefore, from a physical standpoint, even the positions I felt might be physically appropriate for Mr. Aguilar, such as Security Officer or School Crossing Guard, did not appear to be work he felt he could perform. The other complication, of course, is that Mr. Aguilar does not read and write in English. Even for positions such as Crossing Guard, the following was indicated: `Ability to read, write, and speak English.' Thus, from a physical standpoint, given Mr. Aguilar's presentation of his chronic pain and subsequent limitations, and the fact that even very light duty jobs such as Security Officer do require the ability to read and write in English, at this point, I do not believe he is feasible for vocational rehabilitation services."
At a hearing on September 18, 2007, independent certified rehabilitation counselors James Westman and Lei Huff testified, and various medical and rehabilitation reports were admitted into evidence. The submitted reports of the parties' qualified medical evaluators (QME's), Dr. Levin and Dr. Carson, agreed that Aguilar suffered both specific and cumulative injuries and had substantial work preclusions. According to the WCJ, both QME's indicated a permanent disability rating of around 60 percent. Dr. Carson found that Aguilar "is precluded from working at or above shoulder height and has lost 50 percent of his pre-injury capacity for lifting with the upper extremities." "[T]here is a prophylactic preclusion from heavy lifting and also preclusions from climbing, walking over uneven ground, squatting, kneeling, crouching, crawling, pivoting, or other activities of comparable physical effort with respect to both lower extremities." "[Aguilar] is not able to return to his full duties at Hertz and is a Qualified Injured Worker...." Dr. Levin found that "the limitations regarding [Aguilar's] left knee should be no squatting, no kneeling, no prolonged walking, and no heavy lifting." "Aguilar should have no repetitive over-shoulder-level work with either shoulder." The limitation as to his left wrist "should include no heavy gripping and no repetitive use of the left hand." Dr. Levin further found that Aguilar will not be able "to return to his normal job as a car detail person."
Aguilar testified in English at the hearing with some assistance from a Spanish-language interpreter. After discussions on some of the issues in the case, the WCJ granted the parties' requests to submit letter briefs prior to submission of the matter. Both parties filed their briefs on September 21, 2007, and the WCJ issued his findings and award on September 28, 2007. The WCJ found Aguilar to be 100 percent permanently disabled and awarded him lifetime indemnity payments of $490 per week and further medical treatment.
*239 In his opinion in support of the award, the WCJ stated that he agrees with QME's Dr. Levin and Dr. Carson that Aguilar is "significantly disabled with respect to his knees and upper extremities." The WCJ found that the two independent rehabilitation experts who testified at the hearing agreed that Aguilar's "educational background, his native intelligence, and his level of skill in the English language" "together with [his] physical impairment" render him "permanently unemployable." "It is proper to apportion disability brought about by non-industrial causes. The normal variations in native aptitude found among human beings are not the same as disability; that is part of the meaning of LeBoeuf [v. Workers' Comp. Appeals Bd. (1983) 34 Cal.3d 234 [193 Cal.Rptr. 547, 666 P.2d 989]]. An employer takes the employee as he finds him. With all his perceived shortcomings, Mr. Aguilar was able to compete in the open labor market before his injury. As a result of his injury, that ability is gone."
Hertz petitioned for reconsideration of the permanent disability award, arguing in part that Aguilar's limited English language skills, virtual illiteracy even in his native Spanish, and his lack of academic training and aptitude should be reflected by providing him with an appropriate partial, rather than total, permanent disability rating. Hertz contended that "where an otherwise eligible industrially-injured worker cannot benefit from provision of rehabilitative services due to the effects of the injuries, LeBoeuf does indeed `remain good law' to the extent that a non-scheduled permanent disability rating even including a 100% total permanent disability award is appropriate. However, where, as here, the Applicant's inability to return to any employment even with provision of the full panoply of rehabilitation services results from factors unrelated to the effects of the injury, such an award is inappropriate." Hertz cited Espinoza v. Workers' Comp. Appeals Bd. (1994) 59 Cal.Comp.Cases 753 [writ den.] (Espinoza), in support of its claim.
In his answer to the petition for reconsideration, Aguilar argued that the finding of 100 percent permanent disability was a correct and proper application of the principles set forth in LeBoeuf. He argued that "the primary reasons" that he cannot benefit from vocational rehabilitation "are the multiple and severe factors of permanent disability resulting from the work injuries," and that his "education, aptitudes and language skills were only `secondary factors.'"
In his report and recommendation on the petition for reconsideration, the WCJ found that the testimony of both rehabilitation experts established that Aguilar is nonfeasible for vocational rehabilitation and permanently unemployable. "[Hertz] is attempting to obtain apportionment to factors which are not disability. All of the disability awarded in this case is due to the industrial injury; but for the injury, there would be no disability at all. [Hertz's] *240 protestations to the contrary are akin to the regret one might feel after a pat on the head of the proverbial fellow with the eggshell-thin skull. [Aguilar's] deficiencies may have rendered him especially vulnerable to physical disability, but they did not cause it." Accordingly, the WCJ recommended that the petition for reconsideration be denied.
On November 16, 2007, the Board denied reconsideration "for the reasons stated in [the WCJ's] report which we adopt and incorporate."
On May 7, 2008, we granted Hertz's petition for writ of review of the Board's decision.

DISCUSSION

The Parties' Contentions
Hertz contends here, as it did below, that an employer should not be liable for total permanent disability benefits where the determination that an injured worker is not feasible for vocational rehabilitation is due, in part, to nonindustrial causes. Hertz argues that there is a distinction between a nonfeasibility finding due to the physical effects of a worker's industrial injury and the inability to benefit from rehabilitation services for reasons unrelated to that injury. "[W]here an otherwise eligible industrially-injured worker cannot benefit from provision of rehabilitative services due to the effects of the injuries, LeBoeuf does indeed `remain good law' to the extent that a non-scheduled permanent disability rating even including a 100% total permanent disability Award is appropriate. However, where, as here, the Applicant's inability to return to any employment whatsoever even with provision of the full panoply of rehabilitation services, results, in part, from factors unrelated to the effects of the injury, such an award is inappropriate."
Aguilar again contends that the finding of 100 percent permanent disability in his case is a correct and proper application of the principles set forth in LeBoeuf. He argues that substantial evidence in the record supports the finding that it is primarily the effects of his work injuries that prevent him from benefiting from vocational rehabilitation and, therefore, this court must affirm the Board's decision. In addition, Aguilar argues that there is no reasonable basis for Hertz's petition, and he requests that we remand the matter to the Board for a supplemental award of attorney's fees. (Lab. Code, § 5801.)[1]

*241 Relevant Law

Permanent Disability
(1) With few exceptions, all California employers are liable for the compensation provided by the state's workers' compensation system to employees injured or disabled in the course and scope of their employment. (Cal. Const. art. XIV, § 4; see also § 3351.) Section 3202 `"provides that issues of compensation for injured workers "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment."' (Department of Rehabilitation v. Workers' Comp. Appeals Bd. (2003) 30 Cal.4th 1281, 1290 [135 Cal.Rptr.2d 665, 70 P.3d 1076] (Department of Rehabilitation).) This rule is binding upon the Board as well as this court. (Lamb v. Workmen's Comp. Appeals Bd. (1974) 11 Cal.3d 274, 280 [113 Cal.Rptr. 162, 520 P.2d 978] ...; Department of Rehabilitation, supra, 30 Cal.4th at p. 1290.) Moreover, `"[a]ll aspects of workers' compensation law ... are to be liberally construed in favor of the injured worker." [Citation.]' (Department of Rehabilitation, supra, at pp. 1290-1291.)" (Matea v. Workers' Comp. Appeals Bd. (2006) 144 Cal.App.4th 1435, 1443 [51 Cal.Rptr.3d 314].)
(2) An employee who suffers disability as a result of an industrial injury is entitled to disability indemnity. (§ 4650; Gamble v. Workers' Comp. Appeals Bd. (2006) 143 Cal.App.4th 71, 79 [49 Cal.Rptr.3d 36].) Temporary disability indemnity provides "interim wage replacement assistance to an injured worker during the period he or she is healing." (Id. at p. 79.) The right to temporary disability indemnity continues until the employee recovers or becomes permanently disabled. (Id. at p. 80.) "`[T]he right to permanent disability compensation does not arise until the injured worker's condition becomes "permanent and stationary."'" (Department of Rehabilitation, supra, 30 Cal.4th at p. 1292, citing LeBoeuf, supra, 34 Cal.3d at p. 238, fn. 2.) "A disability is considered permanent when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 10152.)[2]
(3) Permanent disability is expressed in percentages. Permanent disability of 100 percent is considered permanent total disability, which requires weekly indemnity payments to the injured worker for life. Permanent disability of less than 100 percent is permanent partial disability, which entitles the injured worker to a certain number of weeks of indemnity payments based on the percentage of the rating. (§ 4658.) Lifetime benefits are also payable to *242 permanent partially disabled workers whose disability is 70 percent or higher; payment of the lifetime benefits begins after the final payment of the benefits payable for the worker's percentage of permanent disability. (§ 4659.) "In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his or her age at the time of the injury, consideration being given to an employee's diminished future earning capacity." (§ 4660, subd. (a).) Prior to the revision of our workers' compensation system effective April 19, 2004, permanent disability considered the employee's diminished ability to compete in an open labor market rather than the employee's diminished future earning capacity. (See Stats. 1993, ch. 121, § 53, p. 1301.)

Apportionment
(4) "`Apportionment is the process employed by the Board to segregate the residuals of an industrial injury from those attributable to other industrial injuries, or to nonindustrial factors, in order to fairly allocate the legal responsibility.' [Citation.]" (Brodie v. Workers' Comp. Appeals Bd. (2007) 40 Cal.4th 1313, 1321 [57 Cal.Rptr.3d 644, 156 P.3d 1100] (Brodie); see Marsh v. Workers' Comp. Appeals Bd. (2005) 130 Cal.App.4th 906, 911 [30 Cal.Rptr.3d 598] (Marsh).) Prior to the revision of our workers' compensation system effective April 19, 2004, "apportionment was `concerned with the disability, not its cause or pathology.'" (Marsh, supra, at p. 912.) "Apportionment based on causation was prohibited. [Citation.]" (Brodie, supra, at p. 1326.) "Instead, a disability resulting from industrial and nonindustrial causes was apportionable `only if the [B]oard finds that part of the disability would have resulted from the normal progress of the underlying nonindustrial disease.' [Citation.] This rule left employers liable for any portion of a disability that would not have occurred but for the current industrial cause; if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause would not alone have given rise to a disability, no apportionment was to be allowed. [Citations.] [¶] Under these rules, in case after case courts properly rejected apportionment of a single disability with multiple causes. [Citations.] In short, so long as the industrial cause was a but-for proximate cause of the disability, the employer would be liable for the entire disability, without apportionment." (Ibid.)
"The plain language of new sections 4663 and 4664 demonstrates they were intended to reverse these features of former section[] 4663.... Thus, new sections 4663, subdivision (a) and 4664, subdivision (a) eliminate the bar against apportionment based on pathology and asymptomatic causes [citations]...." (Brodie, supra, 40 Cal.4th at p. 1327.) That is, under our revised workers' compensation system, "[apportionment of permanent disability shall be based on causation" (§ 4663, subd. (a)), and "[t]he employer *243 shall only be liable for the percentage of permanent disability directly caused by the injury arising out of and occurring in the course of employment." (§ 4664, subd. (a), italics added; see Brodie, supra, at p. 1327.)
The apportionment provisions under new sections 4663 and 4664 apply to this case, regardless of the dates of injury, as the case was pending at the time the revisions became effective. (Kleeman v. Workers' Comp. Appeals Bd. (2005) 127 Cal.App.4th 274, 285-286 [25 Cal.Rptr.3d 448]; Marsh, supra, 130 Cal.App.4th at p. 910; Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd. (2005) 131 Cal.App.4th 517, 525-532 [31 Cal.Rptr.3d 789].)
"Any physician who prepares a report addressing the issue of permanent disability due to a claimed industrial injury shall in that report address the issue of causation of the permanent disability." (§ 4663, subd. (b).) "In order for a physician's report to be considered complete on the issue of permanent disability, the report must include an apportionment determination. A physician shall make an apportionment determination by finding what approximate percentage of the permanent disability was caused by the direct result of injury arising out of and occurring in the course of employment and what approximate percentage of the permanent disability was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries." (§ 4663, subd. (c), italics added.)

The Permanent Disability Rating Schedules
(5) Pursuant to revised section 4660, a new permanent disability rating schedule was adopted effective January 1, 2005. (Regs., § 9805.) Section 4660, subdivision (d), provides that the new schedule "shall apply to and govern only those permanent disabilities that result from compensable injuries received or occurring on and after the effective date of the adoption of the schedule.... For compensable claims arising before January 1, 2005, the schedule as revised ... shall apply to the determination of permanent disabilities when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker." Section 4061 requires an employer to provide notice to an injured employee, when the employer stops paying temporary disability indemnity, that permanent disability either may be or is payable, or that the employer alleges no permanent disability has resulted from the industrial injury. (§ 4061, subd. (a).)

Vocational Feasibility
(6) Vocational rehabilitation services may be provided to an employee who suffered an industrial injury prior to January 1, 2004, if the employee is *244 determined to be medically eligible to participate in such services. (§ 139.5; Regs., § 10124.) The selected rehabilitation counselor then determines the employee's "vocational feasibility." (Regs., § 10124.1, subd. (a).) As part of that determination, the rehabilitation counselor considers, in part, both the employee's current physical limitations and work restrictions and any factors that may prevent the employee's participation in vocational rehabilitation services. (Ibid.)
For employees injured on or after January 1, 1994, if the rehabilitation counselor determines that rehabilitation services are vocationally feasible, the resulting rehabilitation plan must be completed within 18 consecutive months. (Regs., § 10126, subd. (h).) "Vocation rehabilitation plans for employees who lack English language proficiency may include English language training when necessary to return the employee to suitable gainful employment." (Regs., § 10126, subd. (l).)
If the rehabilitation counselor determines that rehabilitation services are not vocationally feasible, the counselor must submit a report that identifies "the specific factor(s) preventing the employee from benefiting from the provision of vocational rehabilitation services. The report shall further identify any recommended action the employee should pursue in order to attain vocational feasibility." (Regs., § 10124.1, subd. (c).)
In LeBoeuf, our Supreme Court held that, when there is a finding of no vocational feasibility, that fact should be taken into account in the assessment of the injured employee's permanent disability rating. (LeBoeuf, supra, 34 Cal.3d at p. 243.) In that case, the employee was working as a bus driver when he was attacked and beaten by four youths. He sustained multiple contusions and abrasions, and also developed an anxiety neurosis. As a result of his condition, he was unable to return to work and a WCJ found him to be 60 percent permanently disabled. He was later found to not qualify for rehabilitation services because few, if any, jobs would be open to him given his condition. (LeBoeuf, supra, 34 Cal.3d at pp. 237-238.) The worker petitioned to reopen his permanent disability award, but the Board denied the petition. (Id. at p. 240.) The Supreme Court annulled the Board's decision and held that a determination that an injured worker cannot be retrained for any suitable gainful employment should be considered in any determination of a permanent disability rating. (Id. at p. 243.)
In LeBoeuf, the finding of no vocational feasibility was entirely due to the disability directly caused by the employee's industrial injury. (LeBoeuf, supra, 34 Cal.3d at pp. 237-238.) And, at the relevant time, an injured worker's permanent disability rating took into consideration the injured worker's "diminished ability ... to compete in an open labor market." (Former § 4660, *245 subd. (a); see LeBoeuf, supra, 34 Cal.3d at p. 243; see also Gill v. Workers' Comp. Appeals Bd. (1985) 167 Cal.App.3d 306, 309-310 [213 Cal.Rptr. 140] (Gill) [the rehabilitation counselor's report of no vocational feasibility is relevant and admissible at the hearing regarding the determination of worker's permanent disability rating].)
(7) Hertz relies on Espinoza, supra, 59 Cal.Comp.Cases 753 [writ den.]. We recognize that because Espinoza and other cases cited here are writ-denied summaries of decisions by the Board, they have no stare decisis effect. However, the Board has approved the citation of writ-denied summaries published in California Compensation Cases. Accordingly, courts may and do cite them in published decisions. (See, e.g., Robertson v. Workers' Comp. Appeals Bd. (2003) 112 Cal.App.4th 893, 899 [5 Cal.Rptr.3d 485].) In Espinoza, the injured worker was found to have a 60 percent permanent disability due to an industrial knee injury. The WCJ took into account the injured worker's nonfeasibility for vocational rehabilitation due to her "`failure to learn to read or to write,'" but determined that this factor did not increase the worker's permanent disability rating. (Espinoza, supra, 59 Cal.Comp.Cases at p. 754.) The Board denied the injured worker's petition for reconsideration. The injured worker petitioned this court for a writ of review, relying on LeBoeuf and Gill. The employer filed an answer contending that LeBoeuf and Gill were distinguishable and did not mandate a higher permanent disability award whenever the injured employee cannot benefit from vocational rehabilitation services; in both LeBoeuf and Gill, the injured employee's vocational unfeasibility was directly related to the medical effects of their injuries, whereas Espinoza's vocational nonfeasibility was due in part to preexisting nonindustrial factors. On September 21, 1994, this court summarily denied the petition for writ of review. (Espinoza, supra, 59 Cal.Comp.Cases at p. 755.)[3]

Analysis
In the case before us, the Board found that Aguilar is 100 percent permanently disabled, and that all of the disability is due to his industrial injury. Our review of the Board's factual determinations is limited to determining whether the Board's decision is supported by substantial evidence in the record. (§ 5952; Lamb v. Workers' Comp. Appeals Bd., supra, 11 *246 Cal.3d at pp. 280-281.) However, the interpretation of a labor statute is a legal question which we review independently, and the Board's erroneous interpretation or application of the law is a ground for annulment of the Board's decision. (Matea v. Workers' Comp. Appeals Bd., supra, 144 Cal.App.4th at p. 1444; Boehm & Associates v. Workers' Comp. Appeals Bd. (1999) 76 Cal.App.4th 513, 515-516 [90 Cal.Rptr.2d 486].)
In this case, Aguilar was not found to be permanent and stationary as to all of his industrial injuries until August 2005, after the effective date of the revisions to our workers' compensation system. However, he had received temporary disability indemnity for some of his industrial injuries for broken periods prior to his last date of work on January 29, 2002. Therefore, Hertz was "required to provide the notice required by Section 4061" (§ 4660, subd. (d))[4] to Aguilar prior to January 1, 2005, when it first stopped paying temporary disability indemnity and Hertz admittedly provided the notice under section 4061 in case No. SJO226456 prior to January 1, 2005. Accordingly, the exception in section 4660, subdivision (d), applies and Aguilar's total permanent disability must be rated using the 1997, rather than the 2005, rating schedule. (Vera v. Workers' Comp. Appeals Bd. (2007) 154 Cal.App.4th 996, 1009 [65 Cal.Rptr.3d 151]; accord, Energetic Painting & Drywall, Inc. v. Workers' Comp. Appeals Bd. (2007) 153 Cal.App.4th 633, 639 [63 Cal.Rptr.3d 210]; Zenith Ins. Co. v. Workers' Comp. Appeals Bd. (2007) 153 Cal.App.4th 461, 465 [62 Cal.Rptr.3d 683]; Costco Wholesale Corp. v. Workers' Comp. Appeals Bd. (2007) 151 Cal.App.4th 148, 157 [59 Cal.Rptr.3d 611].)
Even though Aguilar's permanent disability rating should be determined using the 1997 rating schedule, the rating must consider Aguilar's "diminished future earning capacity" rather than his diminished ability to compete in an open labor market. (§ 4660, subd. (a).) In addition, the rating must consider what approximate percentage of Aguilar's disability was the direct *247 result of his industrial injuries, and what approximate percentage was caused by other factors, including any preexisting conditions. (§ 4663, subd. (d).) Apportionment of permanent disability is based on causation, and is not limited to prior disabilities. (§ 4663, subd. (a).) This is because Hertz is liable only for the percentage of Aguilar's permanent disability directly caused by his industrial injuries. (§ 4664, subd. (a).) "[S]ection 4663, subdivision (a) authorizes apportionment by causation, and section 4664, subdivision (a) confines an employer's liability to the percentage of disability directly caused by the current industrial injury...." (Brodie, supra, 40 Cal.4th at p. 1325.)
We find no evidence in the record to support the Board's finding that Aguilar's industrial injuries directly caused him to be 100 percent permanently disabled. Although the medical reports in the record differ on the actual level of Aguilar's permanent disability, no medical evaluator found Aguilar to be 100 percent permanently disabled. In fact, all the medical evidence indicates that Aguilar, even with his significant work restrictions, is medically eligible for vocational rehabilitation and that his permanent disability rating, according to the WCJ, should be around 60 percent. Therefore, the medical evidence does not support the Board's finding of 100 percent permanent disability.
Aguilar testified at the hearing that he uses a cane to ambulate at home and when going back and forth from his car. He uses his walker, which has a seat, for outings with his children and when he goes somewhere he knows will have no place for him to sit or rest, and he uses a shopping cart for support while shopping. He has lost both strength and range of motion in his knees, he has wrist pain, and he has shoulder pain when he lifts his arms above shoulder level. However, he is able to drive his children to school daily.
The certified rehabilitation counselors agreed that Aguilar's disability, standing alone, did not make him unemployable. Westman testified that Aguilar's use of a walker and cane restrict the types of job training and employment he is eligible for. However, some types of training are also ruled out by Aguilar's limited language skills and education. Thus, Aguilar's limited language skills and education affect his ability to benefit from vocational rehabilitation, just as they affected his ability to compete in an open labor market prior to his injuries.
Huff testified that it is possible that Aguilar might be employable despite his physical limitations and need to use a walker if he had better language skills and education. Customer service jobs, account-clerk, and home-based employment might be available with training, and these jobs make up perhaps 15 percent of the labor market. Huff concluded that Aguilar's limited literacy and education played a large role in her opinion that Aguilar is nonfeasible for rehabilitation.
*248 (8) LeBoeuf holds that, where an employee is found non-feasible for rehabilitation due to disability directly caused by an industrial injury or injuries, that fact must be taken into account in the employee's permanent disability rating. (LeBoeuf, supra, 34 Cal.3d at p. 243.) However, LeBoeuf does not hold that an employee's permanent disability rating must reflect a finding of nonfeasibility where the nonfeasibility finding is due in part to preexisting nonindustrial factors or conditions. Regardless, our revised workers' compensation system precludes such a holding. An employer may only be found liable for permanent disability directly caused by the injured employee's industrial injury (§ 4664, subd. (a)), and apportionment is now based on causation (§ 4663, subd. (a)), so an employer may properly obtain apportionment of a permanent disability to factors that are not disabilities. (Brodie, supra, 40 Cal.4th at pp. 1325-1327.) Moreover, permanent disability considers the injured employee's diminished future earning capacity and not the employee's diminished ability to compete in an open labor market. (§ 4660, subd. (a).)
(9) In conclusion, we determine that the Board's finding of 100 percent permanent disability in this case was based in part on the finding of vocational nonfeasibility, that is, a finding of permanent inability to compete in an open labor market. The finding of vocational nonfeasibility was based in part on preexisting, nonindustrial factors, that is, Aguilar's inability to read and write in English. As we have explained, Hertz is only liable for that portion of Aguilar's permanent disability that is directly caused by Aguilar's industrial injuries, and Hertz is not liable for that portion that is caused by preexisting nonindustrial factors. Therefore, the Board's finding of 100 percent permanent disability must be annulled, and the matter must be remanded to the Board for a redetermination of Aguilar's permanent disability rating.

DISPOSITION
The Board's order of November 16, 2007, is annulled, and the matter is remanded for a redetermination of respondent Aguilar's permanent disability rating consistent with the views expressed in this opinion.
Mihara, J., concurred.
McADAMS, J., Concurring. 
I concur in the judgment. No effective argument has been presented why this result is not compelled by the clear direction of the Legislature in enacting Labor Code sections 4663, subdivision (a), and 4664, subdivision (a), and the interpretation of those sections by our Supreme Court in Brodie v. Workers' Comp. Appeals Bd. (2007) 40 Cal.4th 1313 [57 Cal.Rptr.3d 644, 156 P.3d 1100], as discussed in the *249 majority opinion. However, I write separately to express three concerns: (1) the potential for overbroad application of this opinion to the unfair detriment of unskilled workers with limited education, aptitude, and English language proficiency; (2) the implication that the court finds that Manuel Aguilar's permanent disability rating should be limited to 60 percent on remand; and (3) the citation and discussion of a "writ denied" case summary from the California Compensation Cases.

1. Potential for Overbroad Application: LeBoeuf and the "Aguilar Factor"

LeBoeuf v. Workers Comp. Appeals Bd. (1983) 34 Cal.3d 234 [193 Cal.Rptr. 547, 666 P.2d 989] has been established authority for 25 years, standing for the proposition that before there is a determination of permanent disability, "the employee's potential eligibility for rehabilitation benefits should be considered since an employee's inability to be vocationally rehabilitated is a factor to be considered in determining the percentage of permanent disability." (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 2008) § 8.02[3], p. 8-8, fn. omitted.)
Hertz has consistently maintained in this writ proceeding that LeBoeuf "remains good law." During oral argument Hertz stated that "non-feasibility or inability to meaningfully participate in rehabilitation is a factor worthy of consideration when considering an industrially injured worker's permanent disability, even warranting a 100 percent total permanent disability award." I wish I could be as sanguine. I am concerned about the future of LeBoeuf in light of this opinion. This court has now created what may become known as the "Aguilar factor," generating an issue that will very likely be raised in every case where there is a claim that an employee is unable to be vocationally rehabilitated. Every finding of nonfeasibility could be challenged based on the applicant's intellectual capabilities, educational opportunities, or cultural background. Such a consequence carries the potential for the erosion of LeBoeuf, which would particularly and disproportionally impact the evaluation and permanent disability ratings of industrially injured unskilled workers.
Therefore, I submit that this case should be construed narrowly. This holding should be confined to its facts in order to avoid an application that would make lack of education, limited intellectual ability, or limited skills an issue in every case in which it has been determined that vocational rehabilitation services are not feasible.
Related to this, I trust that the language of this decision will not affect the permanent disability rating process outside of the issue of nonfeasibility. I am concerned that an "Aguilar factor" argument could spill over into permanent *250 disability rating determinations beyond the issue before us. Such concern may be misplaced, but the full ramifications of the concept of "[a]pportionment of permanent disability based on causation" under sections 4663, subdivision (a), and 4664, subdivision (a) of the Labor Code have not been settled and the issue of causation seems to be a rich source of current litigation.
It is worth emphasizing that the nonindustrial factors related to Aguilar's nonfeasibility for vocational rehabilitation (lack of education, aptitude, and language skills) were not and should not be considered to be a cause of Aguilar's permanent disability. All parties in this case agree, at least at this stage, that Aguilar's permanent disability has been caused by industrial factors only. Certainly no one considered Aguilar's educational, aptitude or language limitations to be disabilities. There was no argument made that any of these limitations were "labor-disabling." As the workers' compensation judge (WCJ) recognized, Aguilar worked for 17 years, typically 80 hours a week, as an auto washerhis value to Hertz was hardly inhibited by any lack of education, English language ability, or intellectual skills necessary to accomplish his assigned duties. In other words, it is my view that the causation question at the heart of this case concerns the cause of the finding of nonfeasibility, not the cause of Aguilar's permanent disability.

2. Redetermination on Remand

I agree with my colleagues that this "matter must be remanded to the Board for a redetermination of Aguilar's permanent disability rating." (Maj. opn., ante, at p. 248.) However, I am concerned that the analysis contained in the majority opinion implies that the Workers' Compensation Appeals Board (Board) should find that Aguilar's permanent disability rating "should be around 60 percent." (Maj. opn., ante, at p. 247.) I write separately to emphasize that the Board should not feel constrained by this language in the opinion. The Board should be free to redetermine the permanent disability rating anew, now having the benefit of this decision. I am not convinced that the potential industrially caused factors related to feasibility for vocational rehabilitation have been fully explored in the workers' compensation proceedings thus far. The WCJ seemingly felt compelled to find a 100 percent rating once the vocational experts found nonfeasibility, based on his understanding of LeBoeuf, and there seems to have been no need or opportunity for the parties to develop or argue about the causes of the finding of nonfeasibility or about ratings less than 100 percent. As an example, Aguilar's expert considered the limitations at issue in this opinion to be "secondary factors" and emphasized, as primary factors, his reliance on a cane and his limited use of his upper extremities. Also, Hertz's expert questioned whether Aguilar would be a good candidate for computer training even if proficient in English, *251 because of "his upper extremity problems." Upon redetermination, these questions could be more fully developed consistent with the principles of LeBoeuf and this opinion.

3. The "Writ Denied" Case Reference

My third concern may be relatively unimportant, but I object to the majority's citation of Espinoza v. Workers' Comp. Appeals Bd., a 1994 "writ denied" entry and the other similar entries in footnote 3. (Espinoza v. Workers' Comp. Appeals Bd. (1994) 59 Cal.Comp.Cases 753 [writ den.]; maj. opn., ante, at p. 245, fn. 3.) The referenced Espinoza material contains only a summary of the case and its procedural history and orders, a summary of the contentions in the writ filed with this court, and the notation "writ denied," all prepared by an unknown author. The entry contains no quoted language from the Board. Hertz treats this citation as supportive authority for the proposition that this court has "addressed," "upheld," and "affirmed" the issue before us favorably to employers. The majority opinion treats Espinoza approvingly and gives the impression that the summary denial of the writ does indeed have authoritative value.
I appreciate that it is common in workers' compensation practice to cite to "writ denied" cases and to use these case notations as some kind of court-sanctioned approval of challenged workers' compensation matters. However, I do not approve of the reference to such a publication entry as Espinoza in this opinion. It is well known that there are a variety of reasons why appellate courts summarily deny writs. Contrary to the usage in the arena of workers' compensation, summary denials are certainly not necessarily based on the court's agreement with the challenged ruling or order.
The cases commonly cited for the proposition that appellate courts have approved court usage of "writ denied" summaries do not support the claim that these summaries have been given any precedential effect merely because the writ has been denied. For example, in Robertson v. Workers' Comp. Appeals Bd. (2003) 112 Cal.App.4th 893 [5 Cal.Rptr.3d 485], the case cited by the majority, the court indeed refers to and analyzes a writ denied case. However, the value of the reference is not derived from the fact that an appellate court denied a writ; the value of the extensive discussion of the case notation derives from the fact that the California Compensation Cases entry involves a decision of the Board related to the issue before the appellate court in Robertson and contains instructive quotations from the Board's decision. (See also Wings West Airlines v. Workers' Comp. Appeals Bd. (1986) 187 Cal.App.3d 1047, 1053 [232 Cal.Rptr. 343] [citation to two prior Board decisions analyzed and distinguished by the Board in the case under review]; General Foundry Service v. Workers' Comp. Appeals Bd. (1986) 42 Cal.3d *252 331, 336 [228 Cal.Rptr. 243, 721 P.2d 124] [citation to an en banc opinion of the Board and two later, related cases].)
NOTES
[1] All further statutory references are to the Labor Code.
[2] All further references to regulations are to title 8 of the California Code of Regulations.
[3] See also James v. Workers' Comp. Appeals Bd. (1986) 51 Cal.Comp.Cases 45 (writ den.); Southern v. Workers' Comp. Appeals Bd. (1997) 62 Cal.Comp.Cases 719 (writ den.); Gottschalks v. Workers' Comp. Appeals Bd. (2003) 68 Cal.Comp.Cases 1714 (writ den.); Avei v. Workers' Comp. Appeals Bd. (2004) 69 Cal.Comp.Cases 434 (writ den.); Linam v. Workers' Comp. Appeals Bd. (2007) 72 Cal.Comp.Cases 332 (writ den.). Cf., Montiel v. Workers' Comp. Appeals Bd. (1997) 62 Cal.Comp.Cases 366 (writ den.); T & D Tile Co. v. Workers' Comp. Appeals Bd. (2002) 67 Cal.Comp.Cases 1231 (writ den.); University of California, Berkeley v. Workers' Comp. Appeals Bd. (2007) 72 Cal.Comp.Cases 1421 (writ den.).
[4] Section 4660, subdivision (d) states in relevant part: "For compensable claims arising before January 1, 2005, the schedule as revised pursuant to changes made in legislation enacted during the 2003-04 Regular and Extraordinary Sessions shall apply to the determination of permanent disabilities when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker." Section 4061, subdivision (a) states in relevant part: "Together with the last payment of temporary disability indemnity, the employer shall, in a form prescribed by the administrative director pursuant to Section 138.4, provide the employee with one of the following: [¶] (1) Notice either that no permanent disability indemnity will be paid because the employer alleges the employee has no permanent impairment or limitations resulting from the injury or notice of the amount of permanent disability indemnity determined by the employer to be payable.... [¶] (2) Notice that permanent disability indemnity may be or is payable, but that the amount cannot be determined because the employee's medical condition is not yet permanent and stationary...."