179 Cal.App.4th 1009 (2009)
JOHN C. DUNCAN, as Administrator, etc., Petitioner,
v.
WORKERS' COMPENSATION APPEALS BOARD and X.S., Respondents.
No. H034040.
Court of Appeals of California, Sixth District.
November 25, 2009.
*1015 Vanessa L. Holton, Steven A. McGinty, Carol Belcher, Anthony Mischel and Jesse N. Rosen for Petitioner.
Robert E. Kalunian, Acting County Counsel, Leah D. Davis, Assistant County Counsel, Jeffrey L. Scott and Jason E. Waller, Deputy County Counsel, for Subsequent Injuries Benefit Trust Fund of the State of California as Amicus Curiae on behalf of Petitioner.
No Appearance for Respondent Workers' Compensation Appeals Board.
Butts & Johnson, Arthur L. Johnson and Heather A. Harper for Respondent X.S.
Marcus & Regalado and Marc G. Marcus for California Applicants' Attorneys Association as Amicus Curiae on behalf of Respondent X.S.

OPINION
ELIA, J.
John C. Duncan, administrator of the Subsequent Injuries Benefits Trust Fund of the State of California (SIBTF)[1] petitions this court for review of a decision of the Workers' Compensation Appeals Board, which construed Labor Code section 4659, subdivision (c) to mean that the cost of living adjustment to total permanent disability payments and life pensions are retroactive to the date of injury, no matter when the first payment is actually received. We granted two requests for leave to file briefs as amici curiae.[2]
*1016 In this case of first impression, we hold that the cost of living adjustments pursuant to Labor Code section 4659, subdivision (c), for life pensions and total permanent disability indemnity, are added to those payments, per the words of the statute, starting January 1, 2004, and every January 1 thereafter. Accordingly, we annul the decision of the Workers' Compensation Appeals Board.

Background
On or about June 19, 2007, an injured worker (the Worker) and his employer's insurance company settled the Worker's claim for an industrial injury that occurred on January 20, 2004. The parties stipulated that the Worker's injury became permanent and stationary on October 20, 2006, and that the industrial injuries caused permanent disability of 69.5 percent for which permanent disability indemnity was payable at the rate of $200 per week beginning October 20, 2006, for a period of 437 weeks. The Worker had received temporary disability benefits from 2004 to 2006.[3] However, because the Worker had a preexisting disability caused by Hepatitis B and his HIV-positive status, the Worker submitted a claim to the SIBTF about a month after he settled with his employer.
On or about March 25, 2008, SIBTF and the Worker stipulated that the Worker's January 20, 2004 injury resulted in a 69.5 percent industrial permanent disability, which became permanent and stationary on October 20, 2006; that October 20, 2006, was the date of his first payment for permanent disability; and that the Worker's previous permanent disability combined with his industrial disability resulted in a combined total permanent disability of 100 percent. Accordingly, the Worker would receive $528 weekly payments for total permanent disability as of October 20, 2006 ($728 less $200 paid by the insurance company for the Worker's employer), for 422 weeks, and thereafter $728 weekly for life.
Subsequently, it appears that a dispute arose after the Worker claimed the initial $728 weekly rate that started October 20, 2006, had to be increased by annual changes in the state average weekly wage starting from the date of his injuryJanuary 20, 2004to the date payments became dueOctober 20, 2006.
*1017 On July 15, 2008, the workers' compensation administrative law judge (WCJ) issued a findings and award against the SIBTF. Specifically, the WCJ found that by failing to implement Labor Code section 4659, subdivision (c) in a timely fashion, the SIBTF delayed payments to the Worker in the sum of $3,585.56, and that increased payments to the Worker should have begun on January 1, 2005. The WCJ based these findings on an interpretation of Labor Code section 4659, the application of which to the facts of the case the WCJ found "somewhat puzzling."
After the SIBTF appealed to the Workers' Compensation Appeals Board (WCAB), the WCAB issued its opinion and decision. The WCAB held that Labor Code section 4659, subdivision (c) "provides that for injuries on or after January 1, 2003, where an employee becomes entitled to total permanent disability indemnity or a life pension, that payment shall be increased annually commencing on January 1, 2004. We construe this to mean that each payment of total permanent disability indemnity or life pension that is received on or after January 1 following the date of injury shall be increased, no matter when the first such payment is received. This ensures that severely injured workers are protected from inflation, no matter when they receive their first payment. In some cases there may be years of litigation before there is a determination that an employee is entitled to receive a life pension or total permanent disability indemnity award. In the case of a life pension, the first payment will ordinarily be made years after the date of injury. Nonetheless, the injured worker will have been protected against any inflation that may have ensued between the date of injury and the date of first payment of the life pension or total permanent disability indemnity."
Following the WCAB's decision, the SIBTF petitioned this court for a writ of review, which this court granted on June 30, 2009.[4]

Appellate Review
All judicial powers under the workers' compensation system are vested in the WCAB, subject only to the review by the appellate courts of this state. (Lab. Code, §§ 111, 5301, 5950.)[5] WCJ's hear and decide compensation claims as trial judges, and the WCAB functions as an appellate body. The WCAB has the power to reject the factual findings of a WCJ and to make its own findings of fact, and may affirm, rescind, alter or amend a WCJ's *1018 decision or award. (§§ 5906, 5908.5; Lamb v. Workmen's Comp. Appeals Bd. (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978].)
Our review of a decision by the WCAB is limited. "As to findings of fact, we defer to the [WCAB]'s findings if supported by substantial evidence. (§ 5952; [fn. omitted] [citation].)" (Department of Rehabilitation v. Workers' Comp. Appeals Bd. (2003) 30 Cal.4th 1281, 1290 [135 Cal.Rptr.2d 665, 70 P.3d 1076] (Department of Rehabilitation).) The WCAB has extensive expertise in interpreting and applying the workers' compensation scheme. Thus, in reviewing a workers' compensation provision, we give great weight to the WCAB's interpretation unless it contravenes legislative intent as evidenced by clear and unambiguous statutory language. (E & J Gallo Winery v. Workers' Comp. Appeals Bd. (2005) 134 Cal.App.4th 1536, 1543 [37 Cal.Rptr.3d 208].) "While we accord `"significant respect"' to the [WCAB]'s interpretation of statutes in the area of workers' compensation [citation], we subject the [WCAB]'s conclusions of law to de novo review [citations]." (Department of Rehabilitation, supra, 30 Cal.4th at p. 1290.)

Background on Workers' Compensation
As our sister court in the Fourth Appellate District explained, "Workers' compensation is not an area of the law that routinely gives rise to California appellate court decisions." (Gamble v. Workers' Comp. Appeals Bd. (2006) 143 Cal.App.4th 71, 78 [49 Cal.Rptr.3d 36] (Gamble).)
As did the Gamble court, we believe that a brief synopsis of this state's workers' compensation scheme and its development, an overview of the common terminology, and a discussion of the relevant legal provisions are necessary prerequisites to the resolution of this case.
"`More than 90 years ago, our Legislature was directed to "create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment irrespective of the fault of either party." [Citation.] . . . The Legislature complied with this directive by enacting various provisions of the Labor Code.' [Citation.]" (Gamble, supra, 143 Cal.App.4th at p. 78.)
"`"This system attempts to assure employees of an expeditious remedy both adequate and certain, independent of any fault on the part of employees and employers. At the same time, it provides the employer with a liability which is determinable within defined limits. It represents a philosophy that industry, as a cost of doing business, should provide for the care and *1019 rehabilitation of workers disabled by work injuries. In this way, society supports the program as a[n] integral element of commerce and industry, rather than through tax-supported plans." [Citation.]' [Citation.]" (Gamble, supra, 143 Cal.App.4th at pp. 78-79.)
"`In creating and maintaining a system of workers' compensation, the people of this state made an important public policy decision and transformed how we address workplace injuries. It should be remembered, however, that the purpose of an award under the workers' compensation scheme "`is not to make the employee whole for the loss which he has suffered but to prevent him and his dependents from becoming public charges during the period of his disability. . . . In short the award transfers a portion of the loss suffered by the disabled employee from him and his dependents to the consuming public. . . . Complete protection is not afforded the employee from disability because this would constitute an invitation to malinger or to be careless on the job as he would then lose nothing in assuming a disabled status.'" [Citation.]' [Citation.]" (Gamble, supra, 143 Cal.App.4th at p. 79.)
(1) "The workers' compensation system provides separate classes of indemnity for temporary and permanent disabilities. [Citations.] A disability cannot be both permanent and temporary at the same time. [Citation.]" (Kopitske v. Workers' Comp. Appeals Bd. (1999) 74 Cal.App.4th 623, 630 [88 Cal.Rptr.2d 216].)
(2) Temporary disability is the immediate incapacity to work due to an industrial injury that is reasonably expected to be cured or materially improved with proper medical treatment. (Western Growers Ins. Co. v. Workers' Comp. Appeals Bd. (1993) 16 Cal.App.4th 227, 235 [20 Cal.Rptr.2d 26].) The class of temporary disability serves only as wage replacement during the injured worker's healing period. It is payable at two-thirds of the worker's average weekly earnings. (§ 4653; Edgar v. Workers' Comp. Appeals Bd. (1998) 65 Cal.App.4th 1, 10-11 [76 Cal.Rptr.2d 83].)
(3) When the employee's condition has reached maximum improvement or it has become stationary for a reasonable period of time, and the worker retains some residual disability from the injury, the worker is considered to be permanent and stationary. (Edgar v. Workers' Comp. Appeals Bd., supra, 65 Cal.App.4th at pp. 10-11.) Thereafter, the worker is considered to have a permanent disability. (Id. at p. 10.) When a worker is deemed permanent and stationary, he or she is entitled to permanent disability and temporary disability payments cease. (Kopitske v. Workers' Comp. Appeals Bd., supra, 74 Cal.App.4th at p. 631.)
*1020 (4) Permanent disability indemnity benefits "are intended as reimbursement for the employee's impaired future earning capacity or decreased ability to compete in the open labor market. [Citation.]" (Ritchie v. Workers' Comp. Appeals Bd. (1994) 24 Cal.App.4th 1174, 1179-1180 [29 Cal.Rptr.2d 722].) Permanent disability is expressed in percentages, and if a disability is deemed less than 100 percent, it is referred to as a permanent partial disability. The amount of compensation payable for a given percentage of permanent disability varies according to the date of injury. (Gamble, supra, 143 Cal.App.4th at p. 80.) Payments continue for a set number of weeks, as determined by the permanent disability schedule in section 4658.
(5) Injured employees with permanent disabilities of at least 70 percent but less than 100 percent are entitled to life pension payments, which commence when the employee's permanent disability payments end. An injured worker who is 100 percent permanently disabled is entitled to permanent disability payments for life. (§ 4659, subds. (a), (b).) Relevant here, section 4659, subdivisions (b) and (c) provide, "If the permanent disability is total, the indemnity based upon the average weekly earnings determined under Section 4453 shall be paid during the remainder of life. [¶] (c) For injuries occurring on or after January 1, 2003, an employee who becomes entitled to receive a life pension or total permanent disability indemnity as set forth in subdivision[] . . . (b) shall have that payment increased annually commencing on January 1, 2004, and each January 1 thereafter, by an amount equal to the percentage increase in the `state average weekly wage' as compared to the prior year. For purposes of this subdivision, `state average weekly wage' means the average weekly wage paid by employers to employees covered by unemployment insurance as reported by the United States Department of Labor for California for the 12 months ending March 31 of the calendar year preceding the year in which the injury occurred."
In the case of total permanent disability, pertinent to this case, section 4453 provides, "(a) In computing average annual earnings for the purposes of temporary disability indemnity and permanent total disability indemnity only, the average weekly earnings shall be taken at: [¶] . . . [¶] (9) Not less than one hundred eighty-nine dollars ($189), nor more than one thousand ninety-two dollars ($1,092), for injuries occurring on or after January 1, 2004." Subdivision (c) of section 4453 provides, "Between the limits specified in subdivision[] (a). . ., the average weekly earnings, except as provided in Sections 4456 to 4459,[6] shall be arrived at as follows: [¶] (1) Where the *1021 employment is for 30 or more hours a week and for five or more working days a week, the average weekly earnings shall be the number of working days a week times the daily earnings at the time of the injury."

Discussion
The SIBTF argues that the WCAB was incorrect when it determined that the payment amount of permanent disability indemnity that is set once a worker's disability is considered permanent and stationary must be increased by cost of living adjustments starting from the January 1 after the date of injury.
The SIBTF contends that subdivision (c) of section 4659 provides for annual increases in weekly benefit payments only after an injured employee is entitled to such benefits; the subdivision does not provide for increases prior to the entitlement to benefits. Furthermore, a worker does not have a right to receive total disability indemnity until he or she is permanent and stationary.
Real party in interest, the Worker, contends that the cost of living adjustments should take place "per the very words of the statute, on January 1 following date of injury, which is the only interpretation that will allow the injured workers' benefit level to keep pace with inflation over time."
Accordingly, the resolution of this case depends on this court's interpretation of subdivision (c) of section 4659. The crux of this case is when does the state average weekly wage cost of living adjustment (COLA) begin for a worker who is totally permanently disabled or starts receiving a life pension.
(6) When interpreting a statute, our purpose is to effectuate the Legislature's intent. (DuBois v. Workers' Comp. Appeals Bd. (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) "In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.]" (Id. at pp. 387-388.) "`"If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause *1022 or section in the context of the statutory framework as a whole. [Citations.]'" (Id. at p. 388.) If the statutory language is susceptible to more than one reasonable interpretation, we look to "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (People v. Woodhead (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)
(7) A statute's plain language is a dispositive indicator of its meaning unless a literal reading would lead to absurd consequences the Legislature did not intend. There is a "`"[well-]settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend."'" (Younger v. Superior Court (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014].)
(8) Thus, our goal is to divine and give effect to the Legislature's intent. (Elsner v. Uveges (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) Furthermore, "[w]e do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied." (People v. Superior Court (Zamudio) (2000) 23 Cal.4th 183, 199 [96 Cal.Rptr.2d 463, 999 P.2d 686].)
With this background in mind we turn to the words of the statute. As noted, subdivision (c) of section 4659 provides that when a worker's permanent disability is total, as in this case, for injuries occurring on or after January 1, 2003, again as in this case, "an employee who becomes entitled to receive a life pension or total permanent disability indemnity . . . shall have that payment increased annually commencing on January 1, 2004, and each January 1 thereafter, by an amount equal to the percentage increase in the `state average weekly wage' as compared to the prior year. For purposes of this subdivision, `state average weekly wage' means the average weekly wage paid by employers to employees covered by unemployment insurance as reported by the United States Department of Labor for California for the 12 months ending March 31 of the calendar year preceding the year in which the injury occurred."[7]
At the outset, we must disagree with the Worker that "the very words of the statute" require that a COLA to the total permanent disability payment should take place on January 1 following the date of injury. The only time *1023 that the date of injury is mentioned is with regard to the definition of the state average weekly wage. We agree with the WCJ that for injuries occurring after January 1, 2003, the plain language of the statute requires that total permanent disability payments and life pensions be increased annually commencing January 1, 2004. However, as the WCJ noted, "[w]hile the language is clear enough, such a plain reading would require increases to begin some 19 days prior to the date of injury" in this case.
The SIBTF makes much of the legislative history of Assembly Bill No. 749 (2001-2002 Reg. Sess.), the bill that created section 4659, subdivision (c). (Stats. 2002, ch. 6, § 67.) However, our reading of the Assembly committee's legislative analysis of the bill reveals that the goal of enacting subdivision (c) was to increase benefits for the most seriously injured workers, without increasing them too much. (Assem. Com. on Insurance, Analysis of Assem. Bill No. 749 (2001-2002 Reg. Sess.) as amended Jan. 31, 2002, pp. 1, 15-18.) Regarding cost comparisons between Assembly Bill No. 749 and two bills that then Governor Davis vetoed, there is some mention on page 15 of the analysis concerning a "$7 billion" savings from the "elimination of the retroactive COLA." However, Assembly Bill No. 1176 (2001-2002 Reg. Sess.) had provided in subdivision (c) of section 4659, "Any injured employee who is injured on or after January 1, 1998, and who, on or after January 1, 2004, is receiving or becomes entitled to receive a life pension or total permanent disability indemnity . . . shall have that payment increased annually, commencing January 1, 2004, and each January 1 thereafter, by an amount equal to the percentage increase in the `state average weekly wage' as compared to the prior year." (Assem. Bill No. 1176 (2001-2002 Reg. Sess.) vetoed by Governor, Oct. 14, 2001.) Similarly, Senate Bill No. 71 (2001-2002 Reg. Sess.) had provided in subdivision (c) of section 4659, "Any injured employee who, on or after January 1, 2004, regardless of date of injury, is receiving or becomes entitled to receive a life pension or total permanent disability indemnity . . . shall have that payment increased annually, commencing January 1, 2004, and each January 1 thereafter, by an amount equal to the percentage increase in the `state average weekly wage' as compared to the prior year." (Sen. Bill No. 71 (2001-2002 Reg. Sess.) vetoed by Governor, Oct. 14, 2001.) Both these bills had provided for COLA's to be given to far more injured workers than the current version of section 4659, because the current version applies only to injured workers whose injury occurs after January 1, 2003.
Thus, the legislative history that has been brought to our attention provides little guidance in resolving this issue.
The Legislative Counsel's Digest explained that Assembly Bill No. 749 (2001-2002 Reg. Sess.) "would provide for increased temporary disability *1024 and permanent partial disability and death benefits for injuries or deaths occurring on or after January 1, 2003, with additional increases in benefits phased in over several years." (Legis. Counsel's Dig., Assem. Bill No. 749 (2001-2002 Reg. Sess.) Stats. 2002, ch. 6, par. 21; see also Legis. Counsel's Dig., Assem. Bill No. 486 (2001-2002 Reg. Sess.) Stats. 2002, ch. 866, par. 7.) Pertinent to this case, among other changes in 2002, legislation set a $189 minimum and $1,092 maximum average weekly earnings rates for injuries occurring on or after January 1, 2004. (See Historical and Statutory Notes, 44B West's Ann. Lab. Code, supra, foll. § 4453, pp. 163-164.)
(9) The Worker argues that, in every single case, the length of time that a disability takes to become permanent and stationary will vary from immediately following the date of injury, to "years or multiple years" after the date of injury. Thus, the argument is that for the person who does not start to receive permanent disability payments until five or 10 years "down the road" the value of the payment will have been eroded by inflation if the COLA's do not start until January 1 following the permanent and stationary date. In essence, the Worker contends that because section 3202 provides that workers' compensation statutes "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment," we must construe section 4659, subdivision (c) to mean that the COLA's begin the January 1 following the date of injury, "so that there is a consistent stream of income to keep pace with inflation for those that are totally disabled and entitled to the full wage loss benefit."
We believe that we have to return to the words of the statute to resolve this issue and give significance to every word, phrase, and sentence. As we have observed, subdivision (c) of section 4659 states an employee who becomes entitled to receive a total permanent disability indemnity or life pension shall have that payment increased annually commencing on January 1, 2004, and each January 1 thereafter. In order to interpret this section we must look to the key words of the statute"who becomes entitled to receive a life pension or total permanent disability indemnity . . . ."
The word "entitle" means "to give a right or legal title to: qualify (one) for something." (Webster's 3d New Internat. Dict. (1993) p. 758, col. 1.)
(10) When a worker is injured, an employer must pay temporary disability compensation for the period the employee, while unable to work, is undergoing medical diagnostic procedures and treatment for an industrial injury. (Granado v. Workmen's Comp. App. Bd. (1968) 69 Cal.2d 399, 403 [71 Cal.Rptr. 678, 445 P.2d 294].) Generally, the employer's obligation to pay temporary disability ceases when either: (1) the injured employee returns to work, (2) the employee is deemed able to return to work, or (3) when the *1025 employee's condition becomes permanent and stationary. (Department of Rehabilitation, supra, 30 Cal.4th at pp. 1291-1292.)
(11) In those cases in which the worker has sustained a permanent disability, section 4650, subdivision (b) provides that an employer must make the first permanent disability payment within "14 days after the date of last payment of temporary disability indemnity." Accordingly, the California Supreme Court has inferred that the Legislature has anticipated that an employer has no legal obligation to pay permanent disability indemnity until the obligation to pay temporary disability indemnity has ceased. (Department of Rehabilitation, supra, 30 Cal.4th at p. 1292.) Previously, in LeBoeuf v. Workers' Comp. Appeals Bd. (1983) 34 Cal.3d 234 [193 Cal.Rptr. 547, 666 P.2d 989], the Supreme Court held that "[t]he right to permanent disability compensation does not arise until the injured worker's condition becomes `permanent and stationary.' [Citations.]" (Id. at p. 238, fn. 2.) (12) The Legislature, of course, is deemed to be aware of judicial decisions already in existence, and to have enacted or amended a statute in light thereof. (People v. Overstreet (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288]; accord, People v. Harrison (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].)
(13) Accordingly, we conclude that by using the words "an employee who becomes entitled to receive a life pension or total permanent disability indemnity" the Legislature meant when the right to total permanent disability compensation or a life pension arises; and that is not until the worker's condition has become permanent and stationary for total permanent disability indemnity and for a life pension until after the number of weeks that permanent partial disability payments must be paid. However, this does not end our inquiry. The next question we must answer is when do the COLA's start?
The statute goes on to say that in the case of a life pension or total permanent disability indemnity, an employee "shall have that payment increased annually commencing on January 1, 2004, and each January 1 thereafter . . . ." (§ 4659, subd. (c), italics added.) By the plain words of the statute, once the life pension or total permanent disability payment is set, that payment has to be increased by COLA's starting from January 1, 2004.
The SIBTF argues that the reference to "that payment" does not mean the benefit rate that is set. However, this argument ignores the fact that the definition of the word "rate" means "a charge, payment, or price fixed according to a ratio, scale, or standard." (Webster's 3d New Internat. Dict., supra, p. 1884, col. 3.)
*1026 (14) Under the current statutory scheme, the disability payment for temporary total disability is two-thirds of the "average weekly earnings" during the disability period. (§ 4653.) Calculation of "average weekly earnings" for temporary disability as well as permanent total disability is subject to the maximum and minimum limits set forth in section 4453, subdivision (a). Within those limits, "average weekly earnings" are calculated as provided in subdivision (c). Subdivision (c)(1), (2) and (3) methods of calculation are based on the actual earnings of the employee and subdivision (c)(4) on earning capacity. Subdivision (d) addresses computation of benefits. (§ 4453.)
(15) As noted, a total permanent disability payment is based upon the average weekly earnings determined under section 4453. Under section 4453, the computation of an injured worker's average weekly earnings is arrived at, within specified boundaries set according to date of injury, by multiplying the number of working days a week that the injured worker was employed (if 30 hours or more) by the injured worker's daily earnings at the time of injury. (§ 4453, subds. (a)(1)-(10), (c)(1).)
Although section 4453 applies to temporary disability indemnity and total permanent disability indemnity, section 4453 does not set the level of total permanent disability payments an injured employee is entitled to receive; by its own terms, section 4453 only establishes the employee's average weekly earnings used in calculating the employee's permanent disability payment.
Section 4658 establishes the method of setting the permanent disability payments. That section provides as pertinent to this case: "(c) This subdivision shall apply to injuries occurring on or after January 1, 2004. If the injury causes permanent disability, the percentage of disability to total disability shall be determined, and the disability payment computed and allowed as follows:

 "Column 1Range of percentage Column 2Number of weeks for
 of permanent disability which two-thirds of average weekly
 incurred: earnings are allowed for each
 1 percent of permanent disability
 within percentage range:
 Under 10................ 4
 10-19.75................ 5
 20-24.75................ 5
 25-29.75................ 6
 30-49.75................ 7
 50-69.75................ 8
 70-99.75................ 9"

*1027 As this table illustrates, the weekly payments of two-thirds of the average weekly wage for a set number of weeks depending on percentage of disability apply only to permanent disability ratings up to 99.75 percent. Thereafter, for disability ratings of at least 70 percent but less than 100 percent, 1.5 percent of the average weekly earnings for each 1 percent of disability in excess of 60 percent is to be paid during the remainder of life, i.e., a life pension, after payment for the maximum number of weeks specified in section 4658 have been made. (§ 4659, subd. (a).)
(16) For the purposes of subdivision (a) only, "average weekly earnings shall be taken at not more than one hundred seven dollars and sixty-nine cents ($107.69). For injuries occurring on or after July 1, 1994, average weekly wages shall not be taken at more than one hundred fifty-seven dollars and sixty-nine cents ($157.69). For injuries occurring on or after July 1, 1995, average weekly wages shall not be taken at more than two hundred seven dollars and sixty-nine cents ($207.69). For injuries occurring on or after July 1, 1996, average weekly wages shall not be taken at more than two hundred fifty-seven dollars and sixty-nine cents ($257.69). For injuries occurring on or after January 1, 2006, average weekly wages shall not be taken at more than five hundred fifteen dollars and thirty-eight cents ($515.38)." (§ 4659, subd. (a).) Thus, the cap for average weekly earnings under which the life pension payment is calculated is significantly less than the cap for total permanent disability. (§§ 4453, 4659, subd. (a).)
(17) Where the injured worker is totally permanently disabled, i.e., has a disability rating of 100 percent, "the indemnity based upon the average weekly earnings determined under Section 4453 shall be paid during the remainder of life." (§ 4659, subd. (b).)
As a result, for a totally permanently disabled worker, the calculation of payments starts for a full-time employee with looking at the worker's average weekly wage at the time of injury. However, permanent disability indemnity payments are not increased by operation of law under section 4661.5[8] as are temporary disability indemnity payments. (Duncan v. The Singer Co. (1978) 43 Cal.Comp.Cases 467, 468-470.) Thus, as to the worker whose injury leads to total permanent disability that does not become permanent and stable for a number of years, setting the COLA's from the permanent and stationary date causes that worker to see his or her payment exposed to the ravages of inflation over time, eroding the real value of the benefits.
*1028 (18) For the permanently disabled worker who is entitled to a life pension, i.e., one whose injury is more than 70 percent, but less than 100 percent, delaying until the first life pension payment the addition of the COLA's is inexorably worse. Taking for example a partially disabled worker who is injured after January 1, 2004, and whose permanent disability is 99 percent, the number of weeks to pay out permanent disability payments before the life pension starts is just over 17 years. (§ 4658, subd. (c).)
(19) By adding subdivision (c) to section 4659 it appears that the Legislature has tried to rectify the problem of total permanent disability payments and life pensions not keeping pace with inflation. Although total permanent disability indemnity and temporary disability indemnity start from the same point, i.e., based on the worker's average weekly earnings, they are not the same thing. (Duncan v. The Singer Co., supra, 43 Cal.Comp.Cases 467, 468-470.)
(20) We presume that the Legislature could have written the statute to include the date of injury, or the permanent and stationary date, or the date when the life pension starts to commence the COLA's, but the Legislature did not. Rather, the Legislature chose January 1, 2004, as the start date of the first COLA.[9] "`"If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citations.]'" (Meyer v. Sprint Spectrum L.P. (2009) 45 Cal.4th 634, 640 [88 Cal.Rptr.3d 859, 200 P.3d 295].) As a reviewing court we "`[have] no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' [Citations.]" (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)
(21) Thus, keeping in mind that workers' compensation statutes are to be liberally construed in favor of the injured worker (Smith v. Workers' Comp. Appeals Bd. (2009) 46 Cal.4th 272, 277 [92 Cal.Rptr.3d 894, 206 P.3d 430]), we hold that when an injured worker's total permanent disability payment, or life pension payment is calculated, that payment is subject to a COLA starting from January 1, 2004, and every January 1, thereafter. Here, there is nothing in the language of section 4659, subdivision (c) that requires that COLA's start from the January 1 following the date of injury.

*1029 Disposition

The COLA's found in section 4659, subdivision (c) should be applied to life pensions or total permanent disability compensation as from January 1, 2004. Accordingly, the decision of the Workers' Compensation Appeals Board is annulled and the case is remanded to the WCAB for further proceedings.
Premo, Acting P. J., and Duffy, J., concurred.
NOTES
[1] Labor Code section 4751 provides in relevant part: "If an employee who is permanently partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the previous disability or impairment is a permanent disability equal to 70 percent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury compensation for the remainder of the combined permanent disability existing after the last injury . . . ." The payment for the combined disability is made by the SIBTF. (Subsequent Injuries Fund v. Workmen's Comp. App. Bd. (1970) 2 Cal.3d 56, 59 [84 Cal.Rptr. 140, 465 P.2d 28].)
[2] One amicus curiae brief was filed in support of real party in interest by the California Applicants' Attorneys Association. The other amicus curiae brief was filed in support of the SIBTF by the County of Los Angeles.
[3] The Worker was paid temporary disability from January 20, 2004, to December 16, 2004, and then December 31, 2004, through October 19, 2006, at the rate of $728 per week.
[4] At the same time, this court granted the SIBTF's request for this court to take judicial notice of certain legislative history of Labor Code section 4659.
[5] Unless noted, all statutory references are to the Labor Code.
[6] Code sections not applicable here.
[7] Subdivision (c) of section 4659 was added to the statute by legislation passed in 2002. (See Historical and Statutory Notes, 44B West's Ann. Lab. Code (2003 ed.) foll. § 4659, p. 361.)
[8] Section 4661.5 provides for increases in temporary disability indemnity rates when payment is made two years or more from the date of injury. "The increases in the rate of [temporary total disability] over time reflect inflationary conditions to which the worker is entitled under statute. [Citation.]" (Mote v. Workers' Comp. Appeals Bd. (1997) 56 Cal.App.4th 902, 911 [65 Cal.Rptr.2d 806].)
[9] This date makes sense when you consider that the maximum and minimum rates within which the worker's average weekly earnings must fall were set back in 2002.